# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * **
M.D., a minor,                       *
by his mother and next friend,       *     No. 10-611V
ROSEMARY DILASCIO,                   *
                                     *     Special Master Christian J. Moran
                                     *
          Petitioner,                *
                                     *     Filed: December 17, 2020
v.                                   *
                                     *     relief from judgment, abandonment
SECRETARY OF HEALTH                  *     of counsel
AND HUMAN SERVICES,                  *
                                     *
          Respondent.                *
* * * * * * * * * * * * * * * * * * **
```

Amber Diane Wilson, Wilson Science Law, Washington, DC, for petitioner;
Colleen Clemons Hartley, United States Dep't of Justice, Washington, DC, for respondent.

## ORDER DENYING MOTION FOR RELIEF FROM JUDGMENT[1]

Ms. Dilascio claimed that the diphtheria-tetanus-acellular pertussis (DTaP) vaccine harmed her son, M.D. After reviewing the parties' written evidence but without holding a hearing to receive oral testimony, the undersigned found that Ms. Dilascio did not establish that she was entitled to compensation. Decision, 2017 WL 3600575, at *9 (Spec. Mstr. Fed. Cl. Apr. 26, 2017). When the time for filing a motion for review expired, the Clerk's Office entered judgment on May 30, 2017, apparently ending Ms. Dilascio's claim that the DTaP vaccination harmed M.D.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this order on its website. This posting will make the order available to anyone with the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

However, Ms. Dilascio has filed the pending motion to set aside the May 30, 2017 judgment. She argues that her attorney of record, Corey Kaye, misled and abandoned her. The Secretary opposes Ms. Dilascio's motion to set aside the judgment, arguing that Ms. Dilascio has not established that extraordinary circumstances exist to merit relief from judgment.

For reasons explained below, Ms. Dilascio has not met her burden of establishing that she is entitled to the extraordinary relief of setting aside the judgment. Although Mr. Kaye's work in representing Ms. Dilascio was questionable, his behavior did not amount to misleading or abandoning Ms. Dilascio. Unlike cases in which courts have found that a default judgment demonstrated that attorneys effectively abandoned their clients, the April 26, 2017 decision on Ms. Dilascio's case was on the merits. In addition, the lack of filing a motion for review is not so aberrational to suggest that Mr. Kaye abandoned Ms. Dilascio for appellate work. However, as explained below, an appellate authority may have a different view as to a possible motion for review.

## I.   Background

For ruling on the pending motion, the procedural history shows where Mr. Kaye might have abandoned Ms. Dilascio. Section I.C. Because the parties dispute some aspects of the events during the litigation, the basis for findings regarding the events in litigation is set forth as a foundational matter in section I.B. The background, however, begins with M.D.'s medical history in section I.A.

### A.   M.D.'s Medical History

Unlike the convoluted sequence of events in the litigation, M.D.'s medical history is relatively straightforward. M.D. was born in April 2001.

On April 24, 2006, M.D. received DTaP and inactivated polio vaccinations. Exhibit 3 at 2. M.D.'s health changed dramatically seven days later on May 1, 2006.[2] Ms. Dilascio described M.D. as sleeping more than usual that day, and that night appearing groggy and covered in diarrhea at 11:00 PM. Shortly thereafter, M.D. suffered his first seizure and was taken to the hospital. Exhibit 9 at 2-4,

---

[2] The records indicate that, while M.D. did experience some negative health events between Aril 24, 2006, and May 1, 2006, they were not extreme. Ms. Dilascio recorded that M.D. developed a rash at the injection site the day after his vaccinations, but no fever. Exhibit 9 at 2. M.D. also tested positive for strep on April 27, 2006, and began taking amoxicillin with Augmentin. Id. He later developed a fever on April 28, 2006, and was given Motrin and Tylenol. Id.

Exhibit 7 at 7.  M.D. continued to suffer seizures and remained admitted at Schneider Children's Hospital for nearly three months.  Exhibit 7 at 123.  He was eventually diagnosed with refractory partial epilepsy and neurological impairments secondary to encephalitis of unknown origin.  Decision, 2017 WL 3600575 at *9.  M.D. remained hospitalized until June 4, 2007, when he was able to live at home with at-home care and assistance.  Id.  M.D. remains nonverbal and in need of full medical assistance through the most recently submitted medical records.

## B.    Basis of Factual Recitations concerning Procedural History

To some degree, the parties dispute what happened between Ms. Dilascio and Mr. Kaye.  See Pet'r's Reply, filed Oct. 31, 2018, at 2 ("Mr. Kaye's statement is unreliable and provides a shaky foundation for Respondent's position.").  In analyzing whether Mr. Kaye abandoned Ms. Dilascio, the undersigned hesitates to rely upon any of Mr. Kaye's own statements.  In surrendering his law license, Mr. Kaye has admitted that he could not defend himself against the Grievance Committee's determination that he had acted unprofessionally and mishandled client funds.  Exhibit 46.  Mr. Kaye faces criminal charges.  See exhibits 49-51.  When an attorney acts dishonestly, trusting his statements is difficult.

However, except for a few points, the version of events presented by Ms. Dilascio and Mr. Kaye are similar.  Indeed, the chronology of events set forth and further analyzed below relies primarily on court filings and Ms. Dilascio's notes.  Ms. Dilascio's notes stand in contrast with the lack of material from Mr. Kaye.  Mr. Kaye did not provide, or allude to, any letters or emails in which he summarized oral discussions with Mr. or Ms. Dilascio.[3]  Mr. Kaye's timesheets, which he submitted in support of his application for an award of attorneys' fees and costs, are not very detailed.  They appear to correspond entirely to the Court's docket without any notations of communications with his client or other activities.

---

[3] Presumably, if Mr. Kaye had written letters or emails, he would have produced them with his statement.  The record would contain more useful information if Mr. Kaye had created (and then submitted) documents describing his efforts in this case.  In hindsight, letters from Mr. Kaye to Ms. Dilascio would have been especially wise because of the (dissolving) relationship between Ms. Dilascio and Mr. Dilascio.  Ms. Dilascio and Mr. Dilascio agree that at least for some time, Mr. Dilascio was handling the litigation.  During this time, it appears that Mr. Kaye was updating Mr. Dilascio about the status of his son's case, and, it also appears that Mr. Kaye provided updates in a relatively informal way and at a relatively informal setting, a horse racing track.  Kaye Statement at 2.

Further, the lack of documentation makes understanding the nature of the relationship between Mr. Kaye and his client, Ms. Dilascio, difficult.[4]  Ms. Dilascio's notes suggest that Mr. Kaye counseled her orally, probably through telephone calls.  Nevertheless, the docket, the information from Mr. and Ms. Dilascio, and the undersigned's experience with Mr. Kaye allows the undersigned to set forth the following sequence of Ms. Dilascio's litigation.

### C.    Procedural History

#### 1.    Early Representation through Submission of Initial Expert Report

Mr. Kaye and Stephen Dilascio are acquainted with each other from meeting at horse racing tracks.  ECF No. 183, Petitioner's Attorney Response to Motions to Substitute Attorney of Record and for Relief of Judgment ("Kaye Statement") at 2.  It appears that Mr. Kaye was retained to seek compensation for M.D.'s injuries.  The preceding sentence's use of the passive voice ("was retained") is intentional because the person retaining Mr. Kaye is not entirely clear.  As discussed below, the petitioner in the present case has always been Ms. Dilascio.  However, Ms. Dilascio stated that at points during the litigation, she trusted Mr. Dilascio to keep her apprised of the litigation on behalf of their son.  Exhibit 43 (Affidavit of Rosemary Dilascio) at 2.[5]  It appears that the structure in which Mr. Kaye communicated with Mr. Dilascio, and Mr. Dilascio communicated with Ms. Dilascio, contributes to Ms. Dilascio's claim that Mr. Kaye abandoned her.

Mr. Kaye initially filed a complaint in New York state court, describing the action as "against [M.D.'s] treating pediatricians relating to treatment and care rendered from April 24, 2006 with continuous treatment until October 9, 2007," Petition, filed Apr. 27, 2009, ¶ 16 (case no. 09-266V), and the nature of the action more specifically was "medical malpractice, negligence, medical expenses and lack of informed consent," exhibit 11 (case no. 10-611V).  As an action for

---

[4] The undersigned refers to Ms. Dilascio as Mr. Kaye's client because Ms. Dilascio was the only petitioner in this action.

[5] Exhibit 43 appears to be the first instance of Ms. Dilascio's current attorney, Ms. Wilson, using overlapping exhibit numbering with Ms. Dilascio's initial attorney, Mr. Kaye.  Mr. Kaye filed an exhibit 43, a CD of medical records from North Shore—Long Island Jewish Health Systems, on December 28, 2015, and Ms. Wilson later filed Ms. Dilascio's affidavit as exhibit 43 on May 30, 2018.  All citations to exhibit 43 identify the document to which they refer.

personal injuries that M.D. suffered due to a doctor's malpractice, the New York state action seemed to be the type of case that Mr. Kaye had handled previously.

While the New York state action was pending, Mr. Kaye, on behalf of Ms. Dilascio, filed a petition in the Court of Federal Claims, seeking compensation through the Vaccine Program. The matter was assigned to Chief Special Master Gary Golkiewicz as Case No. 09-266V. At two status conferences in July 2009, the parties discussed the jurisdictional issue for the vaccine case in light of Ms. Dilascio's pending New York state case, and Mr. Kaye noted that he was in the process of obtaining voluminous medical records. Minute entries, issued July 1, 2009, and July 31, 2009 (case no. 09-266V). Pursuant to 42 U.S.C. § 300aa-11(a)(5)(B), the Chief Special Master dismissed this case without prejudice for lack of jurisdiction because the New York state action was pending. Order Concluding Proceedings, issued Aug. 17, 2009 (case no. 09-266V).

On September 10, 2010, Mr. Kaye filed a second case with Ms. Dilascio as the petitioner and requested that all exhibits, affidavits, and other filings from the first case be re-filed in the second case. The request to re-file the documents from the first case into the second case was then granted. Order, issued Feb. 18, 2011. An early task for petitioners is to file the relevant medical records. See Vaccine Rule 2(c)(2) (stating medical records are a required attachment of any petition and listing necessary and appropriate medical records); Vaccine Guidelines at 13-16 Ch. 3 (B) 1-6.

On this foundational task, Mr. Kaye's work was not good. Three times, the presiding special master issued an order to show cause for why the case should not be dismissed for failure to prosecute. ECF Nos. 21, 24, 36. Yet, each time, Mr. Kaye satisfied the special master that Ms. Dilascio was pursuing her claim. See, e.g., ECF No. 37 (Petitioner's Response to Order to Show Cause, filed Feb. 25, 2013).

On September 23, 2013, the case was transferred to the undersigned. ECF No. 49. The undersigned held a status conference on October 23, 2013, and instructed Ms. Dilascio to obtain updated records of M.D.'s recent hospitalization. ECF No. 52. The Secretary was also ordered to file a Rule 4(c) Report, which occurred on December 9, 2013. ECF No. 56, the Secretary's Vaccine Rule 4(c) Report ("Resp't's Rep.").

The Secretary's Report identified the impediments to compensation that Ms. Dilascio needed to address. With respect to the on-table claim that M.D. suffered

an encephalopathy within 72 hours of receiving the DTaP vaccine, the Secretary argued that none of the medical conditions listed in the Qualifications and Aids to Interpretation ("QAI") for a table encephalopathy injury have been met. Resp't's Rep. at 9. With respect to the off-table claim that the DTaP vaccine was the cause in fact of M.D.'s injury, the Secretary argued that Petitioner did not provide an expert report in support of her claim or a reliable medical theory as to how M.D.'s vaccinations caused his encephalopathy. Resp't's Rep. at 12-13.

Around the time that the Secretary filed his report, Mr. Kaye informed Mr. Dilascio that a medical expert was needed. Exhibit 44 (Mr. Dilascio's affidavit) ¶ 20.[6] Ms. Dilascio also documented a conversation from December 2013, in which she noted that the judge had analyzed the documents. Exhibit 48 at 10.[7] Ms. Dilascio's pending motion presented a check showing that Mr. Dilascio wrote an $8,000 check to Mr. Kaye in December 2013 for "Medical records, expert fees, economic evaluation and report, expert affidavit fees." Exhibit 45 at 1.

The undersigned held a status conference on January 8, 2014, and explained that for Ms. Dilascio to prevail on the off-Table claim, she had to present a report from a doctor. To facilitate this process, the undersigned presented a set of instructions regarding expert opinions. ECF No. 57, Order, issued Jan. 10, 2014. The instructions also indicated that the experts' reports could serve as their direct testimony. Id.

The process leading to the filing of the initial expert report took a relatively long amount of time. On August 7, 2014, Ms. Dilascio recorded that Mr. Kaye could not retain an expert from Washington, DC, as planned. Instead, Mr. Kaye had retained Robert Gould, M.D. Exhibit 48 at 10.[8] On October 14, 2014, Mr. Kaye had a telephone conference with Ms. Dilascio, and they discussed her case as well as the upcoming litigation events occurring over the next several months.

---

[6] Exhibit 44 appears to be the second instance of Ms. Dilascio's current attorney, Ms. Wilson, using overlapping exhibit numbering with Ms. Dilascio's initial attorney, Mr. Kaye. Mr. Kaye filed an exhibit 44, Dr. Gould's expert report, on April 29, 2016, and Ms. Wilson later filed Mr. Dilascio's affidavit as exhibit 44 on May 30, 2018. All citations to exhibit 44 identify the document to which they refer.

[7] The reference to "judge" is not accurate. At this point, Mr. Kaye had received only Respondent's Report.

[8] The source of Ms. Dilascio's information is not clear. She could have learned this information from Mr. Kaye directly or from Mr. Dilascio.

Exhibit 48 at 11-14.  Ms. Dilascio also recorded that Mr. Kaye had retained Dr. Gould, given him a $5,000 retainer, and provided a breakdown in costs for Dr. Gould's review.  Id. at 13.  On October 21, 2014, Mr. Kaye wrote a letter to Mr. Dilascio, requesting $28,000 for Dr. Gould's completion of his expert report. Exhibit 45 at 2.

On behalf of Ms. Dilascio, Mr. Kaye filed Dr. Gould's report on June 25, 2015.  Exhibit 22. As discussed below, Dr. Gould's report was not a persuasive report, but it was a report supporting Ms. Dilascio's petition.

Ms. Dilascio's pending motion for relief from judgment does not argue that Mr. Kaye abandoned or misled her during the early stage of this litigation. Although it is accurate to say that Ms. Dilascio's case was proceeding more slowly than most cases in the Vaccine Program, by July 2015, Mr. Kaye had succeeded in obtaining a report from an expert.

### 2.    Completion of Expert Reports and Pre-Trial Briefs

In response to Dr. Gould's report, the Secretary retained an expert, John Zempel.  Dr. Zempel disagreed with Dr. Gould's opinion.  Exhibit A.  The Secretary filed this report on March 1, 2016, and, on April 4, 2016, Ms. Dilascio recorded "per Corey[,] Report put in – Negates Dr. Gould's theory – 72 hours." Exhibit 48 at 2.

Relatively quickly, Mr. Kaye obtained a rebuttal report from Dr. Gould, filing it on April 29, 2016.  Exhibit 44 (Dr. Gould's expert report dated April 28, 2016).  In conjunction with this report, on May 11, 2016, Mr. Kaye sent Mr. Dilascio an invoice requesting $4,125 for Dr. Gould's work.  Exhibit 45 at 3.  On May 12, 2016, Ms. Dilascio recorded that there would be a hearing in Washington, DC, to cross-examine the experts.  Exhibit 48 at 3.

The undersigned set the case for a hearing on December 2, 2016, via an order issued on June 24, 2016.  This order also scheduled a series of intervening steps, such as the deadline for filing an exhibit list, pre-trial briefs, and the pre-trial conference.  ECF No. 127, Order, issued June 24, 2016.  The undersigned set forth the minimum contents of the pre-trial brief in a detailed order issued on July 8, 2016.  ECF No. 128.  The undersigned further reviewed the expected topics in a July 27, 2016 status conference.  ECF No. 133.

Meanwhile, at some unspecified date in the summer of 2016, Mr. Dilascio and Ms. Dilascio divorced. Ms. Dilascio averred that after the divorce, she and Mr. Dilascio were supposed to receive updates about M.D.'s case. Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 4.[9] Ms. Dilascio further averred that in September 2016, she learned that a hearing would be held in December. Id. at ¶ 11. This averment is supported by Ms. Dilascio's notes dated September 15, 2016 stating "Hearing in Dec. Washington D.C." Exhibit 48 at 4.

Mr. Kaye had significant problems filing an exhibit list and a pre-trial brief. However, by October 24, 2016 he had filed both. In this brief, Mr. Kaye suggested that both Ms. Dilascio, who was a petitioner, and Mr. Dilascio, who was not a petitioner, might testify at the hearing. ECF No. 145, Pet'r's Prehear'g Br., filed Oct. 24, 2016, at 3.

For this period of the litigation, Ms. Dilascio has not argued that Mr. Kaye abandoned or misled her and, again, she would be hard pressed to make this claim. While Mr. Kaye's performance in terms of filing documents on time was poor, he tried to advance her case and did make all the necessary filings.

### 3.    Submission of the Case on the Papers

The Secretary filed a pre-hearing brief, maintaining his position that Ms. Dilascio was not entitled to compensation. Resp't's Prehear'g Br., filed Nov. 7, 2016.

The undersigned reviewed the case during a status conference held on November 16, 2016. However, the undersigned cut short any lengthy discussion because the parties represented that they were exploring settlement. ECF No. 151.

While the docket indicates the date of this status conference was November 16, 2016, evidence about when other events took place in November is less clear. For example, without providing a date in her affidavit, Ms. Dilascio attested "By this time, . . . I believed that Mr. Kaye was staying in contact with my ex-husband with regards to the case. Even after divorcing, I had left Stephen in charge of the

---

[9] As part of her pending motion to set aside the judgment, Ms. Dilascio did not provide the divorce decree. Thus, whether the divorce order imposed duties on M.D.'s parents with respect to the Vaccine Program claim is not known.

legal case…." Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 16.[10]  Similarly, Ms. Dilascio's notes indicate that she had a conference call with Corey Kaye and "Steve" on some unspecified date in November.  Exhibit 48 at 5.  During this call, the participants discussed that the hearing on December 2, 2016 would focus on the issue of "72 hours."[11]  Apparently, Mr. Kaye also told Mr. Dilascio and Ms. Dilascio that the cost for Dr. Gould to attend the hearing was $13,000.  Exhibit 44 (Affidavit of Mr. Dilascio) ¶ 24; Exhibit 48 at 5 (Ms. Dilascio's notes include a notation of "$13,000 Gould Fees").  In supporting her motion to set aside the judgment, Ms. Dilascio argues that at that time, she believed that the case was proceeding to a hearing.  Pet'r's Reply, filed October 31, 2018, at 6.  Although the date of this call is not known with certainty, the call probably took place on or before November 18, 2016, because on November 18, 2016, Mr. Dilascio paid Mr. Kaye $13,000.  Exhibit 45 at 4.  This payment of $13,000 for Dr. Gould's anticipated appearance at the hearing is one part of Ms. Dilascio's argument that Mr. Kaye abandoned her.

On November 28, 2016, the undersigned planned to conduct a more substantive conference to discuss the hearing, which was scheduled to start on December 2, 2016.  However, Mr. Kaye stated that Ms. Dilascio wanted to not proceed to a hearing.  Instead, Ms. Dilascio wanted to submit the case on the papers.  Consequently, based upon the representation of Mr. Kaye that he was speaking for Ms. Dilascio, the undersigned cancelled the December 2, 2016 hearing.  ECF No. 152.

Whether Ms. Dilascio had truly authorized Mr. Kaye to request that the hearing be cancelled before the November 28, 2016 pre-hearing status conference is far from clear.  Mr. Kaye asserts that the decision not to pursue the hearing was made in conjunction with the consultation of two other vaccine attorneys.  Kaye Statement at 3.  Mr. Kaye also asserts that, based on those consultations and his own judgment, he recommended to Mr. and Ms. Dilascio that they not pursue the hearing.  Id.  Mr. and Ms. Dilascio both indicated that they were aware of this decision, and that they proceeded upon Mr. Kaye's advice.  Mr. Dilascio averred that Mr. Kaye gave him the impression that foregoing the hearing was a better

---

[10] The circumstantial evidence suggests that Mr. Dilascio oversaw the Vaccine Program claim by mid-November.  Whether Mr. Dilascio had just begun being in charge of the litigation is not clear.  He might have overseen the Vaccine Program claim throughout the litigation.

[11] The Table links DTaP to encephalopathies that occur within 0-72 hours.  42 C.F.R. § 100.3(a) ¶ II.B.

strategy.  Exhibit 44 (Affidavit of Ms. Dilascio) ¶¶ 25-26 (Mr. Kaye "informed me and Rosemary, 'our best chance of any recovery would be on appeal'" and that "the case would be more successful by foregoing the trial.").  Unfortunately, Mr. Dilascio's affidavit is relatively cursory as he did not explain what Mr. Kaye specifically said and when he said it.  Similarly, Ms. Dilascio stated in her affidavit that "Mr. Kaye advised that the case may not have success at trial and he discussed not having the trial but instead he mentioned taking the case to an appeal."  Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 13.

Ms. Dilascio's pending motion appears to identify Mr. Kaye's statement during the November 28, 2016 pre-hearing conference as the first, but not only, time that Mr. Kaye placed his interest ahead of his client's interest.  See ECF No. 185, Amended Memorandum of Law in Support of Motion for Relief from Judgment Denying Entitlement to Compensation Dated May 30, 2017 ("Pet'r's Amd. Mot.") at 11 (stating that Ms. Dilascio believes Mr. Kaye could not financially support continuing this case, and misled her to believe a trial was not in her best interest).

The Secretary has yet another position.  To the Secretary, whether Mr. Kaye had received advance authorization to withdraw the case from a hearing is not important because on the following day, Ms. Dilascio ratified Mr. Kaye's action.  See ECF No. 193, Respondent's Opposition to Petitioner's Motion for Relief from Judgment ("Resp't's Resp.") at 17-18.  The factual basis for the Secretary's ratification point is that on November 29, 2016, Mr. Kaye told Ms. Dilascio that the case had reached an "'end result'" and the next step would be to "appeal."  Exhibit 48 at 6, Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 13.

### 4.    Declining to Submit Evidence Addressing the NCES

With the apparent approval from the parties, the undersigned proceeded to consider the evidence and arguments without any oral testimony.  After review, the undersigned tentatively determined that because M.D.'s seizure took place seven days after the DTaP vaccination, Ms. Dilascio had failed to present persuasive evidence that she was entitled to compensation.  However, the undersigned realized that the National Childhood Encephalopathy Study (NCES) suggested that the whole-cell pertussis vaccine might cause a neurologic injury seven days after vaccination.  The undersigned, therefore, issued an "unusual order," allowing Ms. Dilascio to present a new opinion premised on the NCES.  The evidence would start with the NCES, which associated the whole cell version of the pertussis vaccine with neurologic injuries in a period extending out to seven days.  The

NCES was simply a starting point because Ms. Dilascio would also need to show why a study on the *whole cell* pertussis vaccine provided reliable information about the *acellular* pertussis vaccine, the form that M.D. received. Furthermore, because this task was challenging, the undersigned stated that if Ms. Dilascio wanted to proceed, she would need to retain an epidemiologist and that Mr. Kaye would need to associate with another attorney. Finally, the undersigned advised that this process was likely to take one year to two years to complete. ECF No. 153, Order, issued Feb. 16, 2017.

Ms. Dilascio's notes record a conversation with a Mr. Kaye on March 6, 2017. The entry states "We didn't win and we didn't lose. . . . Judge doesn't think we have a case. Whole cell pertussis … need epidemiologist to make argument." Exhibit 48 at 9. The Secretary argues that the mention of "whole cell pertussis" refers to the NCES, and, therefore Ms. Dilascio was aware of the February 16, 2017 order. Resp't Resp. at 19-20. In contrast, Mr. Dilascio asserts that Mr. Kaye did not tell him about the NCES order. Exhibit 44 (Affidavit of Mr. Dilascio) ¶ 30.

According to Mr. Kaye, he vetted this proposal with Dr. Gould. However, Dr. Gould stated that pursuing this option was not likely to be helpful. Kaye Statement at 3. Mr. Kaye also asserted that he shared this information with Mr. Dilascio and Ms. Dilascio. Id. Dr. Gould, however, testified in a deposition that he did not recall any such discussion with Mr. Kaye. Exhibit E (Depo. Tr.) at 13.

On April 20, 2017, Ms. Dilascio's notes show that she had another conversation with Mr. Kaye. Her notes state: "Attorney had new theory - not apply to M.D.'s case." "Decide if we're going to appeal. Decision will be in 60 days." Exhibit 48 at 7; accord Pet'r's Amd. Mot. at 15. On this same date, Mr. Kaye filed a status report, stating that Ms. Dilascio did not want to present evidence. ECF No. 156. The CM/ECF entry shows that Mr. Kaye filed this document at 4:03 P.M. (EDT), a time that suggests that the conversation between Mr. Kaye and Ms. Dilascio preceded the filing of the status report.

Six days later, on April 26, 2017, the undersigned issued a 14-page decision on the merits denying compensation. 2017 WL 3600575. This decision was not complicated as little persuasive evidence supported either Ms. Dilascio's on-Table or off-Table causes-of-action. To prevail upon the on-Table cause-of-action, Ms. Dilascio was required to provide evidence that M.D. suffered an "encephalopathy," as defined by the Vaccine Injury Table, within 72 hours of his DTaP vaccination. The evidence strongly weighed against Ms. Dilascio's claim. Ms. Dilascio had created a logbook that did not indicate M.D. was having symptoms of an

encephalopathy, although he was recorded as having health problems, like a sore throat, during the three days after the April 24, 2006 vaccination. Id. at *7. The medical records created in May 2006 all indicated that M.D.'s neurologic problem started May 1, 2006, which is seven days after the vaccination. Id. Ms. Dilascio did not present any assertions from witnesses who observed M.D.'s condition that would support a finding that M.D. suffered an on-Table encephalopathy. At best, Ms. Dilascio submitted an opinion from Dr. Gould, who said that M.D. might have suffered an unwitnessed seizure. However, this opinion was not credible. Thus, Ms. Dilascio could not prevail on the on-Table cause-of-action.

Likewise, the April 26, 2017 decision found that Dr. Gould's off-Table opinion was not persuasive. To prevail on this cause-of-action, Ms. Dilascio was required to satisfy the elements set forth in Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005). The undersigned found "Dr. Gould's two reports contain many infirmities." Decision, 2017 WL 3600575, at *8. In particular, Dr. Gould did not propose a sufficiently robust theory to explain how the DTaP vaccine can cause brain damage that manifests in approximately one week. Id. at *9. Thus, the decision concluded that despite the sympathetic nature of Ms. Dilascio's situation, the evidence did not warrant compensation.

### 5.   Not Filing a Motion for Review and Other Actions

Ms. Dilascio averred that Mr. Kaye did not inform her about the decision denying entitlement. Exhibit 44 (Affidavit of Mr. Dilascio) at 4, Exhibit 43 (Affidavit of Ms. Dilascio) at 3. The Secretary does not dispute this, but the Secretary contends that Ms. Dilascio had a responsibility to contact Mr. Kaye about the status of her case. Resp't's Resp. at 16.

A motion for review was not filed within the time the Vaccine Rules permit. Thus, the Clerk's Office entered judgment on May 30, 2017. ECF No. 161.

On May 30, 2017, on behalf of Ms. Dilascio, Mr. Kaye filed a motion to redact the April 26, 2017 decision. ECF No. 160. The motion to redact was partially persuasive.[12]

---

[12] Although Ms. Dilascio filed her motion for redaction more than 14 days after the issuance of the April 26, 2017 decision, she had filed a motion for enlargement of time. Because Ms. Dilascio's motion for enlargement of time was granted, the May 30, 2017 motion for redaction was timely.

On August 25, 2017, Mr. Kaye filed a Notice of Election to file a civil action, rejecting the judgment entered in this matter.  ECF No. 165.

6.    Fee Application

As counsel for Ms. Dilascio, Mr. Kaye filed a motion for attorneys' fees and costs on November 21, 2017.  ECF No. 166.  This motion sought $35,125.00 in expert fees, $57,750.00 in attorneys' fees, and $3,424.77 in disbursements.  The Secretary did not object to the amounts requested and deferred to the undersigned's discretion to determine a reasonable award for attorneys' fees and costs.  ECF No. 167, Respondent's Response to Petitioner's Application for Attorneys' Fees and Costs, filed Dec. 11, 2017, at 2-3.

Upon review of the attorneys' fees motion, the undersigned detected that the motion neglected to include a statement, pursuant to General Order #9, regarding Ms. Dilascio's personally incurred costs.[13]  After he was alerted of this deficiency, Mr. Kaye communicated with Ms. Dilascio to obtain her signature on the General Order #9 statement.  Ms. Dilascio asserted that the communication from Mr. Kaye regarding attorneys' fees and costs was the first time that Mr. Kaye had communicated with her after being informed the case would not go to trial. Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 17.  On behalf of Ms. Dilascio, Mr. Kaye filed the General Order #9 statement on January 3, 2018, which stated that Ms. Dilascio had not incurred any expenses.[14]

On January 4, 2018, the undersigned awarded Ms. Dilascio the amount of attorneys' fees and costs requested in her motion.  Fees Decision., 2018 WL 1095662, at *1 (Fed. Cl. Spec. Mstr. Jan. 4, 2018).[15]  The Fees Decision directed

---

[13] Attorneys, including experienced attorneys, sometimes fail to include the General Order #9 statement.  Mr. Kaye's lack of filing the General Order #9 statement did not suggest any nefarious intent.

[14] The General Order #9 statement did not include the $13,000 that Mr. Dilascio had paid to Mr. Kaye in November 2016, when Dr. Gould was anticipated to testify at a hearing.  Mr. Kaye represented that he intended to return the $13,000 to Mr. Dilascio, but the New York State Bar Investigation denied him access to his financial accounts.  Kaye Statement at 2-3.  In reply, Ms. Dilascio asserts that Mr. Kaye should have reimbursed Mr. Dilascio before New York started to investigate Mr. Kaye.  Pet'r's Amd. Mot. at 15.

[15] At this time, the undersigned was finding that because the Secretary had not interposed any objection to the amount requested in attorneys' fees and costs, the Secretary was waiving any argument about the amount requested.  This waiver, in turn, allowed the undersigned to award the full amount requested.  See Swintosky v. Sec'y of Health & Human Servs., 2017 WL

that payment be made in the form of a check made out to "petitioner and petitioner's attorney, Corey B. Kaye." According to Mr. Kaye, he did not inform Ms. Dilascio about this decision. Kaye Statement at 2.

7.     <u>Disciplinary Order against Mr. Kaye and Ms. Dilascio's Motion to Set Aside the Judgment</u>

On April 25, 2018, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, accepted Mr. Kaye's resignation from the bar and entered an order disbarring him. Exhibit 46. In this opinion and order, the New York judges stated that Mr. Kaye acknowledged that the Grievance Committee of the Ninth Judicial District was investigating him for "professional misconduct, including the 'conversion of multiple client funds.'" <u>Id.</u> at 2. The New York judges further stated that Mr. Kaye "attests that he cannot successfully defend against the allegations." <u>Id.</u>[16]

A few days later, on April 29, 2018, Mr. Dilascio learned about the April 26, 2017 decision. Exhibit 44 (Affidavit of Ms. Dilascio) ¶ 28. In his affidavit, Mr. Dilascio stated that he asked "Attorney Mollica" to review the case. However, Mr. Dilascio did not explain the context for his involving Attorney Mollica. <u>See id.</u> Ms. Dilascio also alleges that she learned about the May 20, 2017 judgment in "late April 2018." ECF No. 178, Motion for Relief from Judgment, at 1.

Ms. Dilascio filed the pending motion to set aside the judgment on May 30, 2018. ECF No. 178. For this motion, Ms. Dilascio was represented by a new attorney, Amber Wilson, who also filed a motion to become counsel of record for Ms. Dilascio. ECF No. 177. In setting forth a chronology of events, the pending motion referenced matters concerning the merits case and the award of attorneys' fees.

---

5899239 (Fed. Cl. Spec. Mstr. Nov. 6, 2017). However, separate from <u>Dilascio</u> case, the Secretary challenged this practice by filing motions for review. The Court of Federal Claims determined that the Vaccine Act obligates special masters to determine the reasonableness of the amounts requested independent of any objection (or the lack thereof) by the Secretary. <u>McIntosh v. Sec'y of Health & Human Servs.</u>, 139 Fed. Cl. 238, 253 (2018).

    Because, as discussed below, Ms. Dilascio's pending motion for relief from judgment does not seek relief from the judgment awarding attorneys' fees and costs, the undersigned's practice of finding the Secretary waived objections, a practice which is no longer in effect, does not alter the outcome of Ms. Dilascio's motion to reopen the May 30, 2017 judgment.

[16] Later, New York prosecutors indicted Mr. Kaye on charges relating to stealing money from clients. <u>See</u> exhibits 49-51.

14

To address, in part, the motion to substitute attorneys, the undersigned directed that Mr. Kaye be served with the underlying motion and the motion to set aside the judgment.  <u>See</u> Rule 83.1(c)(4)(A)(i)(II) of the Rules of the Court of Federal Claims.  The undersigned also requested that Mr. Kaye respond.

Through regular mail, Mr. Kaye submitted a statement received on July 27, 2018.  ECF No. 183.  Mr. Kaye did not oppose the motion to substitute Ms. Wilson as counsel of record.  But, with respect to the motion to set aside the judgment, Mr. Kaye disagreed sharply.  He stated: "At all of the relevant times I litigated this matter in the U. S. Court of Claims on behalf the Dilascio's [sic] and their severely injured son, I made decisions and exercised my judgment that I believed, at all times, to be in the best interests of my clients, and not motivated by personal gain, financial need or pressure, or a 'purported gambling addiction.'"  Kaye Statement at 1.

Having heard from Mr. Kaye, the undersigned granted Ms. Wilson's motion to become counsel of record for Ms. Dilascio.  ECF No. 184.  The undersigned also directed Ms. Wilson to file two separate supplemental memoranda that would respond to Mr. Kaye's representations.  The undersigned required two memoranda because the undersigned understood that Ms. Dilascio was seeking relief from the May 30, 2017 judgment denying compensation and the January 24, 2018 judgment awarding attorneys' fees and costs.  With respect to the January 24, 2018 judgment awarding attorneys' fees and costs, the undersigned directed Ms. Dilascio to address whether the General Order #9 statement was accurate and whether Ms. Dilascio can seek reimbursement of the $13,000 that Mr. Dilascio sent to Mr. Kaye for Dr. Gould's appearance at the hearing that never happened.  Order, issued July 31, 2018.

Now represented by Ms. Wilson, Ms. Dilascio responded.  She clarified that the "Petitioner did not previously, and does not now, intend to seek relief from the judgment awarding attorneys' fees and costs dated January 24, 2018.  Rather, Petitioner is satisfied that her prior counsel's malfeasance as to unreimbursed costs will be adequately resolved by the state court system in New York."  ECF No. 186, Memorandum of Law in Response to Order Dated July 31, 2018 Regarding Judgment awarding Attorney's Fees and Costs Dated January 24, 2018.  With respect to the other judgment, the May 30, 2017 judgment on the merits, Ms. Dilascio argued that "the facts and evidence continue to show that [Mr. Kaye] failed to prosecute Petitioner's case and he actively misled Petitioner in matters regarding her claim; thereby abandoning Petitioner as a client and reneging on his

15

duty as Petitioner's agent, counselor and zealous advocate." ECF No. 185, Pet'r's Amd. Mem., filed Aug. 30, 2018, at 17.

The Secretary opposed the motion for relief from the May 30, 2017 judgment. The Secretary contended that "[t]he evidence in this case does not convincingly show that Mr. Kaye, either through extreme negligence or egregious misconduct, actively misled petitioner, or ever abandoned MD's case." Resp't's Resp., at 13.

Ms. Dilascio replied. She strongly attacked the reliability of Mr. Kaye's statement, arguing that the surrender of his law license and his indictment on criminal charges demonstrates his dishonesty. Ms. Dilascio also maintained that Mr. Kaye did not adequately inform her about her case and effectively abandoned her. ECF No. 196, Reply to Respondent's Response to Petitioner's Motion for Relief from Judgment ("Pet'r's Reply"), filed Oct. 31, 2018.

The undersigned directed the parties to seek information from Dr. Gould regarding his communications with Mr. Kaye, especially in light of Ms. Dilascio's attacks on Mr. Kaye's reliability. This initially was ordered to be an affidavit from Dr. Gould regarding any communications regarding the NCES. ECF No. 197. However, Dr. Gould stated in a May 23, 2019 letter that he no longer had records regarding this case, and had no independent recollection regarding his interactions with Mr. Kaye. Exhibit 52. During a status conference on June 12, 2019, the Secretary stated he was interested in subpoenaing Dr. Gould to obtain additional information, either through testimony or document production. ECF No. 206. Dr. Gould's deposition occurred roughly one year later on July 30, 2020 (ECF No. 239), and the transcript was filed as Exhibit E on August 14, 2020. ECF No. 241.

With the submission of the transcript from Dr. Gould's deposition the motion is ready for adjudication.

## II.    Standards for Adjudication

In accordance with the Vaccine Rules of the United States Court of Federal Claims, a party may seek relief from a judgment or order pursuant to Rule 60 of the Rules of the Court of Federal Claims ("RCFC"). Vaccine Rule 36(a). RCFC 60 is identical to Rule 60 of the Federal Rules of Civil Procedure and the same standards apply for evaluating the rules. Dobyns v. United States, 915 F.3d 733, 737 n.1 (Fed. Cir. 2019); Blake v. Sec'y of Health & Human Servs., No. 03-31V, 2014 WL 7331948, at *4 (Fed. Cl. Spec. Mstr. Sept. 11, 2014).

RCFC 60 states several grounds for relief from a judgment. RCFC 60(b).[17] Motions for relief under RCFC 60(b) "seek…to set aside a final decision and it is incumbent upon the motion-filer to demonstrate that he…is entitled to relief." Kennedy v. Sec'y of Health & Human Servs., 99 Fed. Cl. 535, 550 (2011).  The motion's statements are "not a pleading, like a complaint, in which the factual allegation[s] are presumed true."  Id.  Nor does it constitute a mere invitation for the court to investigate further whether to grant relief.  Rather, that motion seeks to set aside a final decision and it is incumbent upon the motion-filer to demonstrate that he or she is entitled to that relief—now.  Id.

Ms. Dilascio here seeks relief from judgment under Rule 60(b)(6).  The residual catchall provision, Rule 60(b)(6) has been characterized as a "grand reservoir of equitable power to do justice in a particular case."  Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc., 714 F.3d 1289, 1295 (Fed. Cir. 2013) (quoting Stevens v. Miller, 676 F.3d 62, 67 (2d Cir. 2012)).  A movant is entitled to relief under Rule 60(b)(6) if "such action is appropriate to accomplish justice" and only in "extraordinary circumstances." CEATS, Inc. v. Cont'l Airlines, Inc., 755 F.3d 1356, 1361 (Fed. Cir. 2014) (internal quotation marks omitted).  However, RCFC 60(b)(6) does not relieve a party from a "free, calculated, and deliberate choice." Kennedy, 99 Fed. Cl. at 548 (quoting Paul Revere Variable Annuity Ins. Co. v. Zang, 248 F.3d 1, 6 (1st Cir. 2001)).

Ms. Dilascio argues that the extraordinary circumstances warranting relief pursuant to Rule 60(b)(6) is that her attorney, Mr. Kaye, abandoned her.  Negligence of counsel, without more however, is typically insufficient to establish extraordinary circumstances and trigger 60(b)(6).  G.G.M. v. Sec'y of Health & Human Servs., 122 Fed. Cl. 199, 205 (2015), aff'd sub nom. Mora v. Sec'y of Health & Human Servs., 673 F. App'x 991 (Fed. Cir. 2016).  Attorney negligence does not constitute an extraordinary circumstance because the attorney is acting as

---

[17] RCFC 60(b) states: On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under RCFC 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

an agent for the principle (client) who is charged with the acts and omissions of the agent.  Id. at 205-09.

On the other hand, when attorneys effectively abandoned their clients leaving them virtually unrepresented and/or affirmatively misled, extraordinary circumstances may justify relief pursuant to Rule 60.  See, e.g., Lal v. California, 610 F.3d 518, 524 (9th Cir. 2010) (granting relief from dismissal for failure to prosecute where attorney virtually abandoned client and misled him); Cmty. Dental Servs. v. Tani, 282 F.3d 1164, 1171-72 (9th Cir. 2002) (defendant's attorney ignored court orders, neglected motions, missed hearings and other court appearances, failed to file pleadings or serve them on opposing counsel, and otherwise "virtually abandoned his client by failing to proceed with his client's defense despite [repeated] court orders to do so."); Boughner v. Sec'y of Health, Ed. & Welfare, 572 F.2d 976, 978 (3d. Cir. 1978) (vacating judgment where attorney's "egregious conduct amounted to nothing short of leaving his clients unrepresented"); cf. Heim v. Comm'r of Internal Revenue, 872 F.2d 245, 248 (8th Cir. 1989) (stating that "any errors committed by [counsel], even accepting the designation of gross negligence, do not constitute an adequate showing of 'exceptional circumstances'" and distinguishing cases granting relief for attorney negligence because in those cases client was left virtually unrepresented).

Even where petitioners are abandoned by counsel, they must also show that they diligently pursued their rights before relief can be granted under Rule 60(b)(6).  See Gonzalez v. Crosby, 545 U.S. 524, 537–38 (2005); Foley v. Biter, 793 F.3d 998, 1004 (9th Cir. 2015).  A failure to appeal can be held against the moving party in the Rule 60(b)(6) analysis.  Medinol Ltd. v. Cordis Corp., 817 F. App'x 973, 979 (Fed. Cir. 2020).

## III.    Analysis

For purposes of evaluation, Ms. Dilascio's case can be divided into two different periods.  The first period comprises events leading to the April 26, 2017 decision denying her compensation.  The second period consists of the period in which a motion for review was not filed, leading to a judgment against Ms. Dilascio.[18]

---

[18] Ms. Dilascio mentions problems with respect to the award of attorneys' fees and costs. However, because Ms. Dilascio is not seeking relief from the judgment awarding attorneys' fees and costs, these events are largely not relevant.

18

### A.   Events leading to the April 26, 2017 Decision

Before the April 26, 2017 decision, Ms. Dilascio highlights two issues where Mr. Kaye abandoned and/or actively misled her that qualify as extraordinary circumstances warranting relief under Rule 60(b)(6). These issues are the following: (1) submitting the case for adjudication on the papers rather than proceeding to a hearing, and (2) declining to pursue a theory based upon the NCES. The issues are discussed in turn.

### 1.   Foregoing an Entitlement Hearing

Ms. Dilascio argues that Mr. Kaye failed to prosecute her claim by cancelling the scheduled causation hearing five days prior to the trial date. Ms. Dilascio also argues that Mr. Kay actively misled her on the status of her claim by not consulting her prior to canceling the causation hearing and by informing her the best strategy was to pursue an appeal. Pet'r's Amd. Memo. at 23-24.

Ms. Dilascio emphasizes a chronology that suggests Mr. Kaye made the decision to forgo the hearing on his own without consulting her. Initially, before the pre-hearing status conference, Mr. Dilascio had paid Mr. Kaye $13,000 for Dr. Gould's testimony. This indicates that Mr. Kaye intended to proceed with the hearing as of November of 2016. Then, during the November 28, 2016 pre-hearing status conference Mr. Kaye chose not to proceed to the hearing. Finally, Ms. Dilascio learned that her case was not proceeding to a hearing in a discussion with Mr. Kaye on November 29, 2016. See Pet'r's Supp'l Memo. at 12-13, 23-24; Pet'r's Reply at 5-7. Mr. Kaye disputes this chronology asserting that he consulted Ms. Dilascio before proposing not to proceed to a hearing. Kaye Statement at 3. Even under Ms. Dilascio's version of events, she has not established that she is entitled to relief from judgment.

Despite Ms. Dilascio's assertions, Mr. Kaye did not abandon her. Prior to submitting the case on the papers, Mr. Kaye prepared and submitted all relevant documents and briefings, including medical records, an expert report, and a prehearing brief. Further, the record indicates that Mr. and Ms. Dilascio were aware of the decision to not proceed to the hearing, and that it was a strategic one. See Exhibit 43 ¶ 13 (Ms. Dilascio's affidavit stating "On November 29, 2016, Mr. Kaye advised that the case may not have success at trial and he discussed not having the trial but instead he mentioned taking the case to an appeal."); Exhibit 44 ¶¶ 25-26 (Mr. Dilascio's affidavit stating Mr. Kaye "informed me and Rosemary, 'our best chance of any recovery would be on appeal'" and that "the case would be

more successful by foregoing the trial.").  Mr. Dilascio's statements corroborate Mr. Kaye's assertions that he recommended this case not proceed to a hearing. Kaye Statement at 3.

The record does not establish that Mr. Kaye actively mislead Ms. Dilascio about foregoing the entitlement hearing.  Prior to November of 2016, the parties were planning to proceed with an entitlement hearing in December of that year. Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 4; Exhibit 48 at 4.  However, sometime in November of 2016 the strategy changed because it was thought foregoing the hearing was a better strategy.  Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 13 (Ms. Dilascio's affidavit stating "On November 29, 2016, Mr. Kaye advised that the case may not have success at trial and he discussed not having the trial but instead he mentioned taking the case to an appeal."), Exhibit 44 (Affidavit of Mr. Dilascio) ¶¶ 25-26; Exhibit 48 at 6.  Whether the hearing was canceled prior to discussing this with Ms. Dilascio is irrelevant, she was informed of the decision and ultimately agreed to it, as evidenced by the case proceeding to a decision on the papers and not to a hearing.  Further, even if Mr. Kaye initially made the decision without consulting Ms. Dilascio, she could have changed her mind and insisted on a hearing.  Moreover, this is not like cases cited above where unilateral actions (or lack of action) by an attorney results in a failure for the case to be decided on the merits.[19]

Thus, the record does not indicate that Ms. Dilascio was effectively without representation, but rather that a strategic decision was made that ultimately did not play out as initially expected.  Unfortunately, RCFC 60(b)(6) does not relieve a party from a deliberate choice.  Rule 60(b)(6) relief is not available in a case where a party has made a decision (albeit an ill-advised one).  Nemaizer v. Baker, 793 F.2d 58, 62 (2d Cir. 1986)("[A]n attorney's failure to evaluate carefully the legal consequences of a chosen course of action provides no basis for relief from a judgment" under Rule 60(b)(1) or 60(b)(6)); Edward H. Bohlin Co. v. Banning Co., 6 F.3d 350, 356–57 (5th Cir. 1993) (quoting United States v. O'Neil, 709 F.2d

---

[19] Ms. Dilascio argues that Mr. Kaye actively misled her by requesting fees relating to the causation hearing that never occurred, and not repaying those funds.  Pet'r's Amd. Memo. at 24. Whether Mr. Kaye solicited funds that were ultimately unnecessary due to a later decision (here, to forego an entitlement theory) is an ancillary matter and does not support the allegation that Mr. Kaye misled Ms. Dilascio regarding the status or progress of her case. Further, Ms. Dilascio specifically chose not to seek relief from the judgment awarding attorneys' fees in this case. Memorandum of Law in Response to Order Dated July 31, 2018 Regarding Judgement Awarding Attorneys' Fees and Costs Dates January 24, 2018, ECF No. 186.

361, 373 n.12 (5th Cir. 1983) observing that "[t]he broad power granted by [Rule 60(b)(6)] is not for the purpose of relieving a party from free, calculated, and deliberate choices he has made").

##### 2.    Declining to pursue a theory based upon the NCES

Next, Ms. Dilascio argues that Mr. Kaye failed to prosecute her claim by declining to provide briefing on the NCES study that "could have possibly supported Ms. Dilascio's claim." Pet'r's Amd. Mem. at 13-14; Pet'r's Reply at 7-11.

Ms. Dilascio was offered the opportunity to develop a new theory of causation through the NCES study. Order, issued Feb. 16, 2017. ECF No. 153. However, she was cautioned that the study may not be relevant, and only that it had potential to affect her claim. Id. Ms. Dilascio was also told that developing the new theory may require significant investment of resources, including additional expert reports from both sides, and take 1-2 years to fully prepare. ECF No. 153 at 2.

For this topic, the gist of Ms. Dilascio's argument is that Mr. Kaye "actively misled her regarding the best way to proceed." Pet'r's Reply at 8. In particular, Ms. Dilascio contends that Mr. Kaye failed to explore the feasibility of developing the NCES-based evidence with sufficient diligence. Ms. Dilascio seems to acknowledge that Mr. Kaye consulted her shortly before declining to present additional evidence. See Pet'r's Amd. Mem. at 14. Ms. Dilascio's notes from a March 6, 2017 conversation with Mr. Kaye refer to whole cell pertussis and the need for an epidemiologist. Exhibit 48 at 9.[20] Ms. Dilascio again spoke to Mr. Kaye on April 20, 2017 (Exhibit 48 at 7), the same day that Mr. Kaye filed a status report stating that Ms. Dilascio did not want to proceed with an argument related to the NCES study. As noted above, the CM/ECF entry shows that Mr. Kaye filed the status report at 4:03 P.M. (EDT), a time that suggests that the conversation between Mr. Kaye and Ms. Dilascio preceded the filing of the status report. These circumstances indicate that Ms. Dilascio was aware of the status of the case at that time, and the NCES study, further indicating that the decision against developing a new theory was again strategic.

---

[20] Ms. Dilascio claims in her motion that she was not aware of the opportunity to provide additional evidence until April of 2018. Pet'r's Mot. for Relief from Judgment, filed May 30, 2018, at 2.

Ultimately, Ms. Dilascio did not pursue additional evidence related to the NCES study. ECF No. 156. The full extent of the reasons is not clear. However, as the undersigned cautioned, factors weighing against an attempt to develop additional evidence included the uncertain value of the evidence, the significant investment in resources, and the potential for greatly extending these proceedings.

The facts are most unclear as to what Mr. Kaye did or did not do regarding the NCES. Two data points seem to bookend the relevant events. About three weeks after the February 16, 2017 order about the NCES study, Ms. Dilascio's notes document a conversation with Mr. Kaye on March 6, 2017. Then, about six weeks later, Mr. Kaye spoke to Ms. Dilascio on April 20, 2017.

Mr. Kaye's actions between February 16, 2017, and April 20, 2017 are unclear. Mr. Kaye indicates that he consulted with outside counsel, however there is little evidence of this other than Mr. Kaye's own statements. ECF No. 156. Mr. Kaye's statement that this evidence was "fully vetted with the Expert, Dr. Gould" appears to be incorrect as Dr. Gould testified in a deposition that he did not recall any such discussion with Mr. Kaye. Exhibit E at 13. Whether Mr. Kaye gathered sufficient information to provide Ms. Dilascio with good advice is certainly debatable.

However, the quality of Mr. Kaye's advice is less relevant than the fact he advised Ms. Dilascio. Regardless of the quality of the advice Mr. Kaye provided, he provided some advice, participated in status conferences, and submitted filings. The provision of guidance and active participation in litigation differentiates Mr. Kaye from attorneys who abandon their clients by failing to provide advice, to participate in litigation, and to comply with court orders. Following advice, even if bad, is not grounds for Rule 60(b)(6) relief. Mora, 673 F. App'x at 994–95.

Moreover, even if it assumed that Mr. Kaye advised Ms. Dilascio not to pursue the NCES study, such advice may have been justified. The relevance of the NCES study hinges on the applicability of its data on the DTP vaccine (whole cell pertussis) to a different vaccine, the DTaP vaccine (acellular pertussis), which is the vaccine in this case. Prior cases have addressed the distinction between the DTP and DTaP vaccine formulations. These cases have persuasively explained at length why findings relating to the safety of the DTP vaccine are not applicable to the later DTaP vaccine, which was specifically developed to address safety concerns related to the earlier, whole cell DTP formulation. See, e.g. Sharpe v. Sec'y of Health & Human Servs., No. 14-65V, 2018 WL 7625360, at *31-32 (Fed. Cl. Spec. Mstr. Nov. 5, 2018); Taylor v. Sec'y of Health & Human Servs., No. 05-

1133V, 2012 WL 4829293, at *30 (Fed. Cl. Spec. Mstr. Sept. 20, 2012); Holmes v. Sec'y of Health & Human Servs., No. 08-185V, 2011 WL 2600612, at *20 (Fed. Cl. Spec. Mstr. Apr. 26, 2011); Simon v. Sec'y of Health & Human Servs., No. 05-941V, 2007 WL 1772062, at *7 (Fed. Cl. Spec. Mstr. June 1, 2007); Grace v. Sec'y of Health & Human Servs., No. 04-[redacted], 2006 WL 3499511, at *9 (Fed. Cl. Spec. Mstr. Nov. 30, 2006).  These decisions indicate that epidemiological findings relating to the safety of DTP vaccines cannot be transferred to the DTaP vaccine Ms. Dilascio's son received.

The general consensus that studies on the whole-cell pertussis (DTP) vaccine are not readily transferrable to the acellular pertussis (DTaP) vaccine was interrupted by one special master in Kottenstette v. Sec'y of Health & Human Servs., No. 15-1016V, 2017 WL 6601878, at *13 (Fed. Cl. Spec. Mstr. Dec. 17, 2017).  However, upon review, that decision was vacated.  Kottenstette v. Sec'y of Health & Human Servs., No. 15-1016V, 2020 WL 953484, at *5 (Fed. Cl. Feb. 12, 2020) ("the special master's inference that the DPT study applies to the DTaP formulation at lower rates [was] arbitrary and capricious").  On remand, a different special master found the DTP study was in fact not relevant.  Kottenstette, 2020 WL 4197301, at *9 (Fed. Cl. Spec. Mstr. June 2, 2020), mot. for rev. denied, 2020 WL 4592590 (Fed. Cl. July 27, 2020), appeal docketed, No. 2020-2282 (Fed. Cir. Sept. 17, 2020).  Further proceedings in Kottenstette have, as of December 2020, shown that pursuit of the NCES was likely futile.[21]

Thus, Mr. Kaye could reasonably conclude and advise Ms. Dilascio that expert reports about the NCES were not likely to make Ms. Dilascio's case successful.  Consequently, Ms. Dilascio has not established that Mr. Kaye abandoned her before the April 27, 2017 decision.  Mr. Kaye's behavior did not rise to the level of neglect seen in other cases successfully evoking Rule 60(b)(6), such as Cmty. Dental Servs., 282 F.3d at 1171-72.  Mr. Kaye did not ignore court orders, did not neglect motions, did not miss hearings, and did not fail to file pleadings.

The April 27, 2017 decision on the merits issued after Ms. Dilascio developed her case for over six years by submitting medical records, briefing, and expert reports.  Here, there was no default judgment or failure to prosecute.

---

[21] The Federal Circuit has yet to rule on the appeal in Kottenstette.

The lack of a default judgment distinguishes Ms. Dilascio's case from many cases on which she relies such as Cmty. Dental Servs. and Primbs v. United States, 4 Cl. Ct. 366 (1984), aff'd without opinion, 765 F.2d 159 (Fed. Cir. 1985) (table). The Ninth Circuit, which took an expansive view of the availability of relief under Rule 60(b)(6), has since clarified that the outcome in those cases was predicated on the disfavored status of default judgments. See Latshaw v. Trainer Wortham & Co., 452 F.3d 1097, 1103 (9th Cir. 2006) (explaining that its decision in Cmty. Dental Servs. "was explicitly premised upon the default judgment context of that case."). Similarly, in Primbs, counsel's actions were so egregious as to constitute a virtual abandonment of the plaintiff and result in a dismissal of the case for failure to prosecute, a judgment imposed on an involuntary basis. Primbs, 4 Cl. Ct. at 368-70. Citing federal courts of appeals, Primbs recognized that a liberal construction of Rule 60(b) is appropriate in cases where the policy favoring resolution of cases on their merits is at stake—i.e., in cases where the judgment from which relief is sought is either a default judgment or a dismissal for failure to prosecute. Primbs, 4 Cl. Ct. at 367. Similarly, in Freeman and Boughner (also cited by Ms. Dilascio here), counsel's actions resulted in the cases being dismissed and the petitioners losing the ability to have their cases decided on the merits. Freeman v. Sec'y of Health & Human Servs., 35 Fed. Cl. 280, 284 (1996) (holding petitioners were misled by their attorney, which resulted petitioners losing the ability to have their case decided based on the merits); Boughner, 572 F.2d at 977 (granting relief for counsel's gross neglect in failing to file opposing documents). Because the cases Ms. Dilascio cites rest upon different facts, they do not justify reopening the judgment based on events before the April 27, 2017 decision.

## B.      Events after the April 27, 2017 Decision

Ms. Dilascio has identified Mr. Kaye's failure to inform her that a decision was entered and failure to file a motion for review as another point where he abandoned and misled her. Pet'r's Amd. Mem. at 14-15; Pet'r's Reply at 11-12. The failure to file an appeal can constitute attorney-abandonment. For example, in Maples v. Thomas, 565 U.S. 266 (2012), a death-penalty case, the defendant's attorneys filed a postconviction motion based upon ineffective assistance of counsel, then left the law firm with which they had been associated, but failed to file a motion to withdraw or to advise the defendant they could no longer represent him. Id. at 275. When the clerk's office mailed a notice to the attorneys that the trial court had denied the relief, the letters were returned unopened. Id. at 276. Thus, the time for filing an appeal of the denial of postconviction relief expired. Id. at 277. The Supreme Court examined whether Mr. Maples "has shown that his

24

attorneys of record abandoned him." Id. at 283.  The Supreme Court concluded: "Given no reason to suspect that he lacked counsel able and willing to represent him, Maples was surely blocked from complying with the State's procedural rule" regarding the deadline for filing appeals.  Id. at 288.  Thus, the Supreme Court allowed Mr. Maples, on remand, to attempt to show prejudice.

In the context of looking to see whether an attorney abandoned a client at an appellate stage, courts have examined whether the client was diligent.  A prominent case illustrating diligence is Holland v. Florida, 560 U.S. 631 (2010), in which a death-row inmate sent letters to his attorney of record inquiring about the status of his case and imploring the attorney to preserve any appellate rights. When the attorney failed to file an appeal on time, the Supreme Court indicated that attorney's conduct may have been worse than a "garden variety claim of excusable neglect" such that extraordinary relief might be warranted.  Holland, 560 U.S. at 651-52.

While the people seeking equitable relief in Maples and Holland were convicted of committing capital crimes, the Federal Circuit has considered attorney abandonment in the appellate stage in a case involving benefits due to military service.  Sneed v. McDonald, 819 F.3d 1347 (Fed. Cir. 2016).  In that case, the Federal Circuit found that Ms. Sneed should have at least suspected that an attorney was not representing her.  The Federal Circuit stated: "reasonable diligence requires that the client check with the attorney before the statutory filing time is about to run out to confirm that the attorney will undertake the representation."  Id. at 1354.

Here, Ms. Dilascio avers that Mr. Kaye never informed her of the final decision.  Exhibit 43 (Affidavit of Ms. Dilascio) ¶ 19.  Through her attorney, Ms. Dilascio asserts that she learned of the adverse judgment in April 2018.  Pet'r's Mot. for Relief from Judgment, filed May 30, 2015, ¶ 1.  However, Ms. Dilascio's notes show that as of April 20, 2017, she was aware that a decision was imminent and likely would be within 60 days.  Exhibit 48 at 7.  Ms. Dilascio has not described any attempts she made to ascertain the status of her case or to confirm that Mr. Kaye had filed a motion for review.  This is far from diligent efforts to pursue her appellate right.

Moreover, Ms. Dilascio's claim that Mr. Kaye completely abandoned her after the April 26, 2017 decision seems inconsistent with the record.  Mr. Kaye continued to work on Ms. Dilascio's case.  Within the time for filing a motion for review, Mr. Kaye requested additional time to file a motion to redact the April 26,

2017 decision.  Pet'r's Resp., filed May 16, 2017.  Within the extended time for filing a motion for redaction, Mr. Kaye filed a motion for redaction on May 30, 2017.[22]  Mr. Kaye is presumed to have consulted with Ms. Dilascio regarding redaction because the motion not only sought the relatively routine redaction of a minor's name to initials (M.D.), but also the less common redaction of an adult's name, Ms. Dilascio's, to initials.  On August 22, 2017, a redacted version of the decision was published on the Court's website.  Later, on August 25, 2017, Mr. Kaye filed an election to file a civil action.  ECF No. 165.  The motion for redaction and the election to preserve a right to file a civil action advance Ms. Dilascio's interests, not Mr. Kaye's interest.

As the Vaccine Act permits, Mr. Kaye did seek an award of his attorneys' fees and costs on November 21, 2017.  ECF No. 166.  Ms. Dilascio argues that Mr. Kaye's filing of a motion for attorneys' fees fits within a larger fraudulent scheme.  Because of Mr. Kaye's financial problems (stealing money from clients), he had an incentive to resolve Ms. Dilascio's case as quickly as possible because he could obtain compensation for his work in her case after it ended.  See Pet'r's Amd. Memo. at 12, 15-16 (alleging that Mr. Kaye was aware funds paid in this case were used for his own gains).

While the undersigned is reluctant to say anything good about a disbarred attorney, Mr. Kaye did not seem to rush to receive compensation for his work in representing Ms. Dilascio.  If Mr. Kaye were truly interested in obtaining reimbursement for his attorneys' fees and costs as quickly as possible, he could have filed a motion for an award of attorneys' fees and costs on an interim basis at many points in time since the case's filing in 2010.  So, the filing of a motion for review would not necessarily impede Mr. Kaye's receipt of attorneys' fees and costs.  Moreover, even after judgment entered in Ms. Dilascio's case on May 30, 2017, Mr. Kaye did not file a motion for attorneys' fees and costs until November 21, 2017, a delay of approximately six months.  This chronology suggests that regardless of Mr. Kaye's wrongdoing in representing other clients, he was not prematurely ending his representation of Ms. Dilascio to obtain attorneys' fees quickly.[23]  If Mr. Kaye were litigating Ms. Dilascio's case to maximize the

---

[22] May 30, 2017 is a few days after the expiration of the time for filing a motion for review of the April 26, 2017 decision.  See Vaccine Rule 23(a) (allowing 30 days for filing a motion for review).

[23] How Mr. Kaye pursued an award of attorneys' fees and costs is a separate issue, one that is not relevant to the pending motion to set aside the May 30, 2017 judgment.  Ms. Dilascio

recovery of attorneys' fees, then, arguably, the submission of a motion for review would have advanced that goal because Mr. Kaye likely would have received compensation for his work in filing a motion for review.

The prosecution of the November 21, 2017 motion for attorney's fees further calls into question Ms. Dilascio's charge that Mr. Kaye had abandoned her.   The undersigned directed Ms. Dilascio to submit a General Order #9 statement.   Order, issued Dec. 14, 2017.   Mr. Kaye, accordingly, filed an affidavit from Ms. Dilascio on January 3, 2018.   Ms. Dilascio has not persuasively explained how Mr. Kaye could obtain her signature on this affidavit without communicating to her about the status of her case.   See exhibit 43 (Ms. Dilascio's affidavit) ¶ 17.   Even after receiving an award of attorneys' fees and costs on January 4, 2018, Mr. Kaye continued to work on Ms. Dilascio's case by timely moving to redact the attorneys' fees and costs decision.   Pet'r's Mot. Redact, filed Jan. 11, 2018.   As with the first motion to redact discussed above, this second motion presumes that Mr. Kaye discussed redaction with Ms. Dilascio, and the motion again requested to redact Ms. Dilascio's name from the decision.[24]

Ms. Dilascio's motion to set aside the judgment raises the specific question of whether Mr. Kaye's failure to file a motion for review constitutes attorney abandonment.   While it is true that he did not file a motion for review, that choice could be for myriad reasons.[25]   Ms. Dilascio may legitimately argue that, although a motion for review had little chance of success, a motion for review would have given her *some* chance of prevailing.   Without a motion for review, she had *zero* chance of receiving compensation because in the absence of a motion for review, judgment entered against her.   Despite its facial validity, this argument proves too much.   This reasoning would effectively require attorneys to file motions for

_____

is not attempting to set aside the judgment regarding attorneys' fees and costs entered on January 24, 2018.

[24] Neither of Mr. Kaye's motions to redact were pro forma requests to redact all identifying information.   Each motion to redact included a hand-marked copy of the respective decision redacting both M.D.'s and Ms. Dilascio's names to initials.

[25] Mr. Kaye generally asserted that he made decisions after consulting Ms. Dilascio. Kaye Statement at 2.   He specifically states that he consulted Mr. Dilascio and Ms. Dilascio about whether to file a motion for review, but they were against this idea because, according to Mr. Kaye, they were tired of litigation, including divorce litigation.   Id.   If Mr. Kaye's account were true, then the extraordinary relief of setting aside a judgment would not be warranted because a decision not to file an appeal does not warrant Rule 60(b)(6) relief.   G.G.M., 122 Fed. Cl. at 207.

review in all cases or risk being considered to have committed professional negligence sufficient to constitute extraordinary circumstances. As a special master whose decisions are subject to a motion for review, the undersigned is reluctant to make such a sweeping statement.[26]

As discussed above, courts have been more receptive to reopen previously resolved cases when the resolution was procedural — based upon a failure to prosecute or a default. However, when the resolution was based on the merit of the case, reopening is less appropriate. The distinction between procedural defaults and merit-based decisions is one reason to decline to reopen Ms. Dilascio's case. On the other hand, there is less precedent about resolving a motion to reopen a judgment based upon a failure to appeal a merit-based decision. Appellate guidance on this topic might be appropriate. An appellate authority also might explain the procedural mechanism by which Ms. Dilascio could institute a motion for review.

Regardless of any future appellate guidance, while Ms. Dilascio is now arguing in her May 30, 2018 motion to set aside the May 30, 2017 judgment because, in part, Mr. Kaye did not file a motion for review that might have prevented that judgment, little persuasive evidence indicates that Ms. Dilascio instructed Mr. Kaye to file this motion in May 2017. Given the circumstances, such as Mr. Kaye's filing of other motions around this time, Ms. Dilascio has not established that the failure to file a motion for review means Mr. Kaye abandoned her.

## IV.   Conclusion

Ms. Dilascio selected an attorney, Mr. Kaye, who did not always represent her well. But, poor representation is markedly different from failing to represent her at all. Accordingly, the motion to set aside the May 30, 2017 judgment is DENIED.

**IT IS SO ORDERED.**

S/ Christian J. Moran
Christian J. Moran
Special Master

---

[26] It would seem that judges of the Court of Federal Claims, who receive and evaluate motions for review, are better positioned to determine whether a motion for review should be filed.