# In the United States Court of Federal Claims

No. 10-611V
Filed: April 9, 2021
Reissued for Public Availability: April 27, 2021*

---

**M.D. a minor, by his mother and next friend, ROSEMARY DILASCIO,**

        *Petitioner,*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**

        *Respondent.*

---

*Amber Diane Wilson*, Wilson Science Law, Washington, DC, for the petitioner.

*Colleen Clemons Hartley*, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, for the respondent.

## MEMORANDUM OPINION AND ORDER

***HERTLING**, Judge*

        The petitioner, Rosemary Dilascio, on behalf of her minor child M.D., filed a petition under the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10 through 34 (2012), seeking compensation for injuries M.D. allegedly sustained following a diphtheria-tetanus-acellular pertussis ("DTaP") vaccination in April 2006. The special master entered judgment on the merits on May 30, 2017, denying compensation. The petitioner subsequently moved for relief from judgment pursuant to Rule 60(b) of the Rules of the Court of Federal Claims ("RCFC"), arguing that her former counsel had abandoned her during the proceedings on the merits. The special master denied the petitioner's motion in December 2020.

        Pursuant to RCFC App. B 36, the petitioner now seeks this Court's review of the special master's denial of her motion for relief from judgment. She argues that the special master

---

*\* Pursuant to Vaccine Rule 18(b), this opinion was initially filed on April 9, 2021, and the parties were afforded 14 days to propose redactions. The parties did not propose any redactions. Accordingly, this opinion is reissued in its original form for posting on the court's website.*

.

erroneously concluded that her former counsel did not abandon her and erred in finding that the petitioner had not been diligent in pursuing her rights.  Reviewing the special master's decision for abuse of discretion, the Court denies the petitioner's motion for review.

## I.    BACKGROUND

The Court begins with a recitation of the facts.  Because the petitioner claims her attorney failed to represent her adequately throughout the pendency of her case on the merits before abandoning her, it is necessary to trace in detail the history of this case, which spans a period of more than ten years.  The Court provides a summary of initial filings in this case for context before turning to the events central to the petitioner's claim—namely, events surrounding the cancellation of the entitlement hearing, the special master's order related to the National Childhood Encephalopathy Study ("NCES"), and the decision on the merits.  The Court then summarizes the evidence before the special master in issuing his decision denying the petitioner's motion for review.

### A.    History Through the Decision on the Merits

#### 1.    Petition and Medical Records

The petition in this case was filed on September 10, 2010.  (ECF 1.)  The petitioner's attorney of record, Corey B. Kaye, filed the petition along with an affidavit from the petitioner.[1]  (*Id.*)  The petition requested:

> [C]ompensation under National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 et seq. (Supp. 2000), for the injury of [M.D.] who received a DTaP and IPV vaccination on April 24, 2006, and who thereafter suffered sudden, severe allergic symptoms beginning with rash at injection site within 24 hours and the "Table Injury" known as Disorder of the brain (Encephalopathy) within seven days of administration of the DTaP vaccine, including first seizure on May 1, 2006 at approximately 11 PM, requiring immediate hospitalization with chronic seizure disorder and brain encephalopathy continuing to date. In the event that it be determined that the above-stated is not defined as a "Table Injury," than [*sic*] it

---

[1] The petitioner in this case initially filed a complaint in New York state court (Index No. 19193/08) on counts related to medical malpractice.  Subsequently, the petitioner filed an action in this court (Case No. 09-266V), which was dismissed without prejudice while the New York state action was pending.  The petition filed on September 10, 2010, included as attachments the dismissal without prejudice of Case 09-266V and an order of the Supreme Court of New York discontinuing the state court action without prejudice.  (*See* ECF 1 at 14-17.)  The supporting exhibits, papers, and affidavits filed with the original petition (Case No. 09-266V) were re-filed in the present case.  (ECF 13.)

is specifically alleged that the above-stated injuries were "caused-in-fact" by the above stated vaccinations.

(ECF 1 at 4.)[2]

Vaccine Rule 2(c)(2) requires the attachment of medical records to a vaccine petition filed in this court.  RCFC App. B 2(c)(2)(A)-(B).  Ms. Dilascio's petition, as filed, did not attach any medical records.  (*See* ECF 1.)  The presiding special master issued numerous orders granting motions to extend the time for the petitioner to file medical records.  (ECF 7, 9, 10, 11, 15, 17, & 18.)  The special master thereafter issued orders in April 2012, July 2012, and February 2013 directing the petitioner to show cause why the case should not be dismissed for failure to prosecute due to the unfiled medical records.  (ECF 21, 24, & 36.)  The petitioner assured the court that she would proceed with the case and indicated medical records were forthcoming.  (ECF 16, 22, & 37.)

The petitioner filed a statement of completion on November 13, 2012, indicating that "all medical records pertinent to this claim have been filed as of this date."  (ECF 34.)  The respondent then indicated that several medical records were still missing.  (ECF 35.)  After delays filing the missing records, by September 2013 (approximately three years after the petition was filed), the court received notice that the petitioner was filing a compact disk with the last of the petitioner's medical records.  (ECF 48.)

On September 23, 2013, the case was reassigned to a new special master who presided over the remainder of the case.  (ECF 49.)

### 2.    Expert Report

Vaccine Rule 4(c) requires the respondent to "file a report setting forth a full and complete statement of its position as to why an award should or should not be granted."  RCFC App. B Rule 4.  Pursuant to an October 24, 2013 order of the special master, on December 9, 2013, the respondent filed its Rule 4(c) Report ("Report").  (ECF 52 & 56.)

The Report found that M.D. "was a previously healthy little boy until onset of epilepsy at 5 years of age on May 1, 2006."  (ECF 56 at 2.)  The Report chronicled M.D.'s medical history and hospitalizations and identified several impediments to compensation for either an on-Table or an off-Table claim.[3]  For an on-Table claim, the Report found that "none of the medical

---

[2] Unless otherwise indicated, this memorandum opinion cites to the page numbers automatically generated by the court's electronic filing system rather than the internal pagination of filed documents, some of which are unpaginated.

[3] The Vaccine Injury Table is a "table of vaccines, the injuries, disabilities, illnesses, conditions, and deaths resulting from the administration of such vaccines, and the time period in which the first symptom or manifestation of onset or of the significant aggravation of such

3

conditions listed in the [Qualifications and Aids for Interpretation (defining the terms used in the Table)] for a Table encephalopathy injury have been met in this case." (*Id.* at 9.)  In particular, the Report noted that: "M[.D.]'s first neurological symptom was a seizure.  This occurred seven days post-vaccination, outside of the table time frame of 0-72 hours." (*Id.*)

Regarding an off-Table causation-in-fact theory, the Report explained that the "petitioner must establish by preponderant evidence that the DTaP vaccine was the 'legal cause' for his brain injury." (*Id.* at 10.)  To do so, the Report noted that the petitioner needed a medical report or "scientific explanation in support of the causation theory that is reputable and reliable." (*Id.* at 11.)  It found the petitioner had "not provided an expert report in support of her claim of a vaccine injury," nor had she presented "a reliable medical theory as to how the DTaP (or IPV) vaccine caused M[.D.]'s encephalopathy." (*Id.* at 12.)  The Report concluded that, without more evidence, the petitioner had not made out a prima facie case. (*Id.* at 16.)

The special master held a status conference with the parties on January 8, 2014, to discuss the need for an expert report.  (ECF 57.)  The special master ordered the petitioner to file an expert report by May 9, 2014, and included as an attachment to the order a document titled "Instructions for Expert Witnesses." (ECF 57 & 57-1.)  The order indicated that the expert reports would serve as direct testimony at the petitioner's entitlement hearing.  (ECF 57.)

The petitioner apparently had trouble retaining an expert and obtaining a timely expert report, requesting several extensions of time.  (ECF 61, 63, 66, 69, 72, & 79.)  These motions were all granted in some form.  (ECF 62, 65, 68, 71, 73, & 81.)  On June 25, 2015, more than a year after the initial deadline, the petitioner filed a five-page expert report by Dr. Robert J. Gould, M.D.  (ECF 82.)

Dr. Gould suggested the possibility that M.D.'s seizures could have begun within the first 72 hours after vaccination, noting that potential "subtle" seizures could have gone undetected. (*Id.* at 2.)  He also argued that the "72 hour cutoff is a completely arbitrary number," and that "there is nothing in the medical literature that states that 72 hours is the cut off point for encephalopathy being manifested at least partially by seizures." (*Id.* at 3.)

---

injuries, disabilities, illnesses, conditions, and deaths is to occur after vaccine administration for purposes of receiving compensation under the Program."  42 U.S.C. § 300aa-14.  A petitioner may demonstrate eligibility for compensation through two methods: an on-Table or off-Table claim.  For an on-Table claim, a petitioner must show she "sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table . . . or died from the administration of such vaccine, and the first symptom or manifestation of the onset" occurred within the time period set forth by the Table.  42 U.S.C. § 300aa-11(c)(1)(C)(i). For an off-Table injury, "[i]f the claimed injury is not listed in the Vaccine Injury Table ('off-Table injury'), the petitioner may seek compensation by proving causation in fact." *Lombardi v. Sec'y of HHS*, 656 F.3d 1343, 1351-53 (Fed. Cir. 2011).

4

The deadline for respondent's expert report was briefly suspended until the petitioner filed additional records pertaining to M.D.'s initial hospitalization.  (ECF 107.)  On March 1, 2016, the respondent filed its expert report by Dr. John Zempel, M.D., Ph.D.  (ECF 116-1.)  Dr. Zempel challenged the basis for Dr. Gould's opinion, explaining that the petitioner's report makes its conclusion "without a theory of causality or direct support in the medical and epidemiological literature."  (*Id.* at 8.)  Dr. Zempel expressed his opinion that "it is extremely unlikely that the DTaP vaccine caused the onset of the catastrophic epilepsy in this case."  (*Id.* at 13.)  He did "not know why" M.D. developed catastrophic epilepsy, noting that an unexplained, sudden epilepsy onset "infrequently, but regularly occurs at any tertiary medical center with specialized epilepsy care."  (*Id.*)  Mr. Kaye filed a rebuttal report by Dr. Gould on April 29, 2016.  (ECF 120.)

### 3.    Entitlement Hearing

At a status conference on May 11, 2016, the petitioner and respondent discussed dates, duration, and location for a hearing on entitlement, and the special master suggested that the hearing occur in New York, where the petitioner lives, "if the petitioner wishes to testify in person."  (ECF 121 at 1.)  Accordingly, on June 24, 2016, the special master entered an order setting an entitlement hearing for December 2, 2016, in New York, New York.  (ECF 127 at 2.)

The special master's order setting the hearing also identified preliminary steps to the hearing, including the filing of a table of contents by July 6, the submission of prehearing briefs by October 3, and the scheduling of a pre-hearing status conference on November 16.  (*Id.* at 1-2.)  Mr. Kaye had difficulty filing a timely table of contents and pretrial brief despite the special master's warning that "the parties should not expect any extensions for pretrial briefs."[4]  (ECF

---

[4] Mr. Kaye missed several deadlines to file a table of contents, as the special master summarized in a July 8, 2016 order:

> On June 24, 2016, the undersigned issued an order directing petitioner to file a corrected table of contents by July 6, 2016. Previously, on June 9, 2016, the undersigned ordered petitioner to file a corrected table of contents for exhibits by June 23, 2016. Petitioner's previous deadlines for this task were May 25, 2016, and June 8, 2016. Petitioner, however, missed the first deadline (May 25, 2016), and filed an incorrect document by the second deadline (June 8, 2016). Petitioner missed the June 23, 2016 deadline, which resulted in the June 24, 2016 order creating the July 6, 2016 deadline. Petitioner has now missed the fourth deadline, July 6, 2016.

> The petitioner's failure, again, to comply with the order regarding the filing of a table of contents is not substantially justified. Consequently, pursuant to Vaccine Rule 5(c), the amount

141; *see also* ECF 128 & 143.)  The special master accepted Mr. Kaye's table of contents on September 15, 2016.  (ECF 139 & 140.)  Mr. Kaye filed the petitioner's pretrial brief on October 24, 2016.  (ECF 145.)

The petitioner's relatively succinct, three-page pretrial brief explained that "[t]he Petitioner's [*sic*] intend to call the Petitioner's parents, Dr. Gould and Dr. Zempel to testify." (ECF 145 at 3.)  It further requested that "30 minutes be set aside for oral testimony by Dr. Gould.  The Petitioner's [*sic*] respectfully propose that cross-examination of the respective expert's [*sic*] be permitted based upon the traditional format of oral questioning."  (*Id.*)  The final section noted that "[t]he Petitioner's counsel has opened discussions with the Respondent's counsel regarding the possibility of settlement.  No further information is available at this time." (*Id.*)

The respondent filed a detailed prehearing brief on November 7, 2016.  (ECF 149.)  The respondent anticipated calling one witness—the respondent's medical expert, Dr. Zempel—and proposed cross-examination of the parties' experts.  (*Id.* at 20-21.)  The respondent's brief made no mention of settlement discussions.  (*See* ECF 149.)

The petitioner's brief had provided that the petitioner would "call the Petitioner's parents."  (ECF 145 at 3.)  The respondent noted in its brief that it was "unclear to respondent whether petitioner intends to call both parents to testify in this case," given that Mr. Dilascio was not (and to date is not) a petitioner in this case.  (ECF 149 at 2 n.1.)  The respondent requested an affidavit or proffer of proposed testimony for Mr. Dilascio, in keeping with the affidavit already filed by Ms. Dilascio, prior to the hearing.  (*Id.*)  The special master entered an order on November 9, 2016, providing that if Mr. Dilascio planned to testify, the petitioner was ordered "to present an affidavit from Mr. Dilascio by Monday, November 28, 2016," at the risk of the preclusion of his testimony during the hearing.  (ECF 150 at 1.)

At a November 16, 2016 status conference, the parties reported to the special master that settlement negotiations were ongoing.  (ECF 151.)  Nevertheless, the entitlement hearing remained scheduled for December 2, but its location was moved to the federal courthouse on Long Island, New York.  The special master also scheduled a final prehearing status conference for November 28.  (*Id.*)

As reported in a November 28 order, at the November 28 status conference, the petitioner's counsel informed the special master "that he would like ruling based on the records filed to date without the submission of any additional evidence."  (ECF 152.)  Accordingly, the

---

of attorneys' fees will be reduced by $500.00.  This $500 is in addition to the previous $500 deduction ordered on June 24, 2016, for a total $1,000.00 reduction.

(ECF 128 at 1 (emphasis in bold omitted).)

special master cancelled the December 2 entitlement hearing, and the case was submitted on the record already before the special master.  (*Id.*)

### 4.      Order on the National Childhood Encephalopathy Study

Following the cancellation of the entitlement hearing, the special master began an evaluation of the petitioner's case on the merits.  In an order on February 16, 2017, the special master informed the parties that he had determined, based on an initial review of the case, "that the evidence does not preponderate in favor of compensation."  (ECF 153 at 1.)  Before issuing a final decision, he recommended an alternative in the belief that "additional evidence could potentially change the outcome."  (*Id.*)

The special master advised that the NCES might prove useful to the petitioner's claim. The NCES studied "children who had received the whole cell pertussis vaccine" and found that "these children had an increased risk of a neurologic episode within seven days of vaccination." (*Id.*)  Special masters had found in favor of other petitioners based upon the NCES.  (*Id.* at 1-2.) Because M.D. had received the *acellular* pertussis vaccine rather than the *whole-cell* version studied in the NCES, further evidence would be needed to show why the study of the whole-cell pertussis vaccine would, or should, apply to the acellular vaccine.  (*Id.* at 2.)

The special master's February 2017 order suggested that the petitioner "may wish to consider presenting an expert report" based on the NCES, because such "additional evidentiary development based on NCES could produce a favorable result for" the petitioner.  (*Id.* at 1-2.) The order suggested a course of evidentiary development that would include three expert reports: a report from a person knowledgeable about the manufacturing of the pertussis vaccine; an epidemiologist report; and a neurologist report.  (*Id.* at 2.)  The order noted that: "[d]evelopment of this evidence should be guided by an attorney with experience in the Vaccine Program. Therefore, if Ms. Dilascio intends to proceed with a claim based upon the NCES, Mr. Kaye will be strongly encouraged (and possibly ordered) to associate with another attorney."  (*Id.*) Development of the necessary evidence was estimated to take approximately one year, with a hearing anticipated in 2019.  (*Id.*)  The special master cautioned Ms. Dilascio that "the outcome is not guaranteed."  (*Id.*)

The special master held a status conference on March 7, 2017, to discuss the NCES order. (*Id.*; ECF 154.)  At that status conference, the petitioner requested 30 days to determine whether she wished to present additional evidence.  (ECF 154.)  On April 19, 2017, the petitioner filed a status report explaining that "[a]fter consultation with both Petitioner's parents and outside counsel, it is respectfully submitted that Petitioners do not wish to submit further documentation or expert reports at this time."  (ECF 156*.*)

5.      Rulings on the Merits and Attorney's Fees[5]

On April 26, 2017, the special master issued a decision on the merits denying compensation ("Merits Ruling").  (ECF 157.)  In the Merits Ruling, the special master found that, with respect to an on-Table claim, the petitioner "has failed to present evidence that establishes, on a more-likely-than-not basis, that M[.D.] suffered an encephalopathy within 72 hours of the April 24, 2006 DTaP vaccination."  (*Id.* at 12.)  With respect to the off-Table injury claim, the special master found that the petitioner failed to present persuasive evidence to satisfy prongs 1 and 3 of the standard of proof established by *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).  (*Id.* at 14.)  The special master determined that Dr. Gould's reports contained "many infirmities, leading to a conclusion that his opinion is not persuasive."  (*Id.* at 13.)

The petitioner was granted an enlargement of time to move to redact the Merits Ruling. (ECF 158 & 159.)  The petitioner filed a motion to redact on May 30, 2017, and sought redaction to initials of M.D.'s name and the petitioner's name.  (ECF 160-1.)  The special master granted the redaction request as to M.D. but denied the request as to Ms. Dilascio, finding she had provided no justification.  (ECF 163.)  The clerk entered judgment on May 30, 2017 (ECF 161), and a public decision was issued on August 22, 2017 (ECF 164).  The petitioner then moved to reject the judgment and to file a civil action pursuant to 42 U.S.C. § 300-aa-21(a).  (ECF 165.)

Mr. Kaye moved for attorney fees on November 21, 2017 (ECF 166), including as attachments affidavits substantiating his fees and those of Dr. Gould (ECF 166-1 & 166-2).  The special master entered an order on December 14, 2017, alerting the petitioner that: "General Order #9 requires that the petitioner sign a statement regarding petitioner's costs.  Here, the fees motion does not include a statement regarding petitioner's costs."  (ECF 168.)  The special master instructed the petitioner to sign and file a statement detailing any costs Ms. Dilascio had personally incurred or, in the alternative, ordered Mr. Kaye to explain his efforts to obtain the General Order #9 statement.  (*Id.*)  On January 3, 2018, Mr. Kaye filed a General Order #9 statement, bearing Ms. Dilascio's signature, indicating that she had not incurred any costs beyond those listed in Mr. Kaye's fee application.  (ECF 169.)

The special master awarded Ms. Dilascio the full amount of her requested attorney fees and costs via a check made payable to "petitioner and petitioner's attorney, Corey B. Kaye." (ECF 170.)  The clerk entered judgment awarding attorney fees and costs in the lump sum of $96,299.77 on January 24, 2018.  (ECF 174.)

---

[5] The petitioner's RCFC 60(b) motion seeks relief from the judgment on the merits of her claim, not from the special master's judgment awarding attorney fees and costs.  (*See* ECF 246 at 14 n.15.)  The factual history regarding the award of attorney fees and costs is included to provide context on Mr. Kaye's communication with his clients and with the special master during the relevant time.

**B.     RCFC 60 Motion**

**1.     Motion to Substitute and Initial Filings**

On May 30, 2018, the petitioner filed a motion to substitute Amber Wilson as her attorney of record, in place of Mr. Kaye.  (ECF 177.)  She also filed that same day a motion for relief from judgment pursuant to RCFC 60(b).  (ECF 178.)  The RCFC 60(b) motion asserted that Mr. Kaye "deliberately deceived Petitioner regarding her claim and, through malfeasance, failed to prosecute Petitioner's meritorious claim, causing undue hardship to Petitioner and warranting relief and justice."  (*Id.* at 3.)

The special master entered an order directing that Mr. Kaye be served by mail with the motion to substitute attorney and the motion for relief from judgment in order to allow Mr. Kaye to respond to both filings; in particular, the special master "encouraged [Mr. Kaye] to respond to the motion for relief from judgment."  (ECF 182.)

Mr. Kaye responded on July 27, 2018.  (ECF 183.)  He did not challenge the motion to substitute.  (*Id.* at 1.)  Mr. Kaye acknowledged in his response that he had surrendered his license to practice law in the State of New York and had been disbarred by the Appellate Division, Second Department, of the New York Supreme Court on April 25, 2018.  (*Id.*)  He resigned from practice in acknowledgment that he had come under investigation by the New York Bar's Grievance Committee of the Ninth Judicial District for professional misconduct, including conversion of multiple clients' funds.[6]  (*See* ECF 178-5.)  He therefore could no longer legally represent Ms. Dilascio.

The special master granted the petitioner's motion to substitute counsel on July 31, 2018.  (ECF 184.)  To resolve the petitioner's motion for relief from judgment, the special master ordered the parties to submit additional briefs and ordered Ms. Dilascio to "seek an affidavit from Dr. Gould about any communications regarding the NCES."  (*Id.*; ECF 197.)  Dr. Gould was later served with a subpoena and deposed.  (ECF 209 & 239.)  The submission of additional evidence was completed by August 19, 2020.  (ECF 242.)

---

[6] New York prosecutors subsequently indicted Mr. Kaye and his law partner, also disbarred, later that year on twenty-nine counts of grand larceny and one count of first-degree scheme to defraud for deceiving clients and converting their settlement disbursements.  (*See* ECF 190-1 at 1.)  Mr. Kaye and his partner were indicted for "allegedly stealing more than $7 million from the settlements between January 2010 and May 2018."  (*Id.*)  The record does not reveal the outcome of the criminal prosecution, but, during oral argument on this motion, the petitioner's counsel indicated that the criminal charges remain pending.  According to a news article, Mr. Kaye's former law partner, charged with him, pleaded guilty to similar charges in July 2019.  Zachary R. Dowdy, *Ex-Attorney Lenchner Pleads Guilty to Stealing More Than $8 million From Clients*, Newsday (July 19, 2019), https://www.newsday.com/long-island/crime/lawyer-attorney-lenchner-stealing-guilty-1.34033250.

### 2.   Evidence

#### a.   Affidavits

Mr. and Ms. Dilascio each filed affidavits in support of the petitioner's motion.  (ECF 178-2 & 178-3.)  Mr. Dilascio attested in his affidavit to meeting Mr. Kaye informally in early to mid-2009.  (ECF 178-3 at 1.)  Mr. Kaye presented himself as a personal-injury and medical-malpractice lawyer who was "very successful."  (*Id.*)  Ms. Dilascio was focused on care for M.D., so Mr. Dilascio was the main contact for the family on the petition, receiving assurance from Mr. Kaye that he would be kept updated, although Mr. Dilascio only "occasionally" received "general" updates from Mr. Kaye via telephone.  (*Id.* at 2.)  According to Mr. Dilascio, Mr. Kaye provided "ambiguous and unclear answers" as to why the case was languishing.  (*Id.*)

Mr. Dilascio attested that Mr. Kaye advised the Dilascios of the need for a medical expert and suggested Dr. Gould for their expert report, because Dr. Gould had examined M.D. and consulted with his physicians on medical treatment while M.D. was in the hospital.  (*Id.* at 3.)  The Dilascios jointly paid for Dr. Gould's expert services.  (*Id.*)

When it came time to discuss whether to proceed with the entitlement hearing, Mr. Dilascio "was in favor" of going to trial and was "ready willing and able to participate in any way."  (*Id.*)  Mr. Dilascio paid Dr. Gould $13,000 from his personal account for Dr. Gould to testify; this sum was never reimbursed, despite the award of costs.  (*Id.*)  Mr. Dilascio averred that "after the conversation deciding to forego the trial, I never heard from Mr. Kaye."  (*Id.*)  Mr. Dilascio disclaimed any awareness of any settlement discussions or of the special master's order suggesting that evidence from the NCES might be beneficial to the petitioner.  (*Id.* at 3.)  He "was not aware that this case had ended or that the Court issued a Final Order until on or about April 29, 2018."  (*Id.*)  Mr. Dilascio remained of the opinion that Mr. Kaye misled the Dilascios because Mr. Kaye could not adequately support the costs of litigating the matter.  (*Id.* at 4.)

Ms. Dilascio attested in her affidavit that although Mr. Dilascio had initially been the family's point of contact with Mr. Kaye, after the Dilascios' divorce in summer 2016 "it was agreed upon that both my ex-husband and I were to received updates about the case."  (ECF 178-2 at 1.)  Ms. Dilascio "was not ever informed about any possible settlement discussions" and was "not ever presented with any informal settlement offers."  (*Id.* at 2.)  In her affidavit, she further attested that she was not initially aware that any formal decision had been issued on her petition, and Mr. Kaye never informed her "that there was limited time to seek an appeal or the date of the deadline to file an appeal."  (*Id.*)  Regarding events after the Merits Ruling, Ms. Dilascio stated in her affidavit:

> After being informed that the case would not go to trial, I was not contacted by Mr. Kaye again until he called to ask about having me sign a paper needed so he could get fees for his work on the case.  I was under the belief that Mr. Kaye was filing to get payment for his attorney fees.  I did not know that our payments to Dr. Gould should have been reimbursed and I believed that it was our responsibility to pay for the expert costs.  Mr. Kaye did not indicate that our payments

to him for Dr. Gould's services could be reimbursed and only indicated that his fees were paid by the Court.

(*Id.* at 3.)

### b.    Ms. Dilascio's Notes

Ms. Dilascio kept handwritten notes about the progression of the case.  These notes document her understanding of the case based on the periodic telephonic updates Mr. Kaye provided.  The petitioner filed her handwritten notes as an exhibit in August 2018.  (ECF 185-1.)  Her early notes, from December 2013, August 2014, and October 2014, describe attempts to secure an expert report.[7]  (*Id.* at 10.)

On April 4, 2016, Ms. Dilascio noted: "Report put in- Negates Dr. Gould's theory- 72 hours" (*id.* at 2), presumably in response to the respondent's expert report filed on March 1, 2016 (ECF 116).  On May 12, 2016, Ms. Dilascio recorded "Everything Filed.  Expert Report.  Zempel – St. Louis. Responding Report – Gould. Cross Examine each other's experts.  Hearing done in Washington – Judge/Lawyer.  72 hours."  (ECF 185-1 at 3.)  Ms. Dilascio's next note was written on September 15, 2016.  She noted, "Hearing in Dec. Washington D.C.," and noted what appear to be the expected participants: "Master, expert for govt., McCloud-Glen council office [Glen McCloud, respondent's counsel], Gould, Corey [Mr. Kaye], Me.  72 hr window.  Gould . . . $25-30,000 – Gould's fee.  ALPHEN [*sic*]."  (*Id.* at 4.)  Her note suggests that she anticipated attending the hearing in December, and that Mr. Kaye had advised her as to the *Althen* standard.

Ms. Dilascio's next note, presumably written sometime in November, referenced a conference call with Mr. Kaye and Mr. Dilascio.  It flagged the date November 16, apparently a reference to the status conference the special master held on that date, and noted: "Hearing Dec 2nd Central Islip Federal Court . . . Dr. Zempel wants to discredit Dr. Gould . . . US Attorney (cross examine).  $13,000 Gould Fees."  (*Id.* at 5.)  It is unclear whether the note itself was written before, on, or after November 16.  On November 29, 2016, one day after the November 28 pretrial conference at which Mr. Kaye had indicated to the special master that Ms. Dilascio wanted to forego an entitlement hearing, Ms. Dilascio's wrote: "Convo with [Corey] spoke to Glen Mcloud.  End result.  Nothing is going to move Master to-- (7 days) table injury will remain

---

[7] Ms. Dilascio's August 7, 2014 note provided: "Could not get experts from DC as planned.  Got Dr. Robert Gould – pediatric neurologist.  Will review M[.D.]'s records.  We consulted with Dr. Gould when M[.D.] was in Schneiders."  (ECF 185-1 at 10.)  Her October 17, 2014 note provided in part: "Consulted with Dr. out of GW – expert set up vaccine program.  Could not participate in case – scheduling.  Consulted with Dr. Robert Gould Wednesday – Corey met with him after reviewing M[.D.]'s case . . . .  Gould has to dispute any other cause of injury other than vaccine . . . .  If they refute Gould's report they can cross examine Gould.  We can cross examine their expert."  (*Id.* at 11-14.)

Alphin injury.  Then appeal." (*Id.* at 6.)  The reference to an appeal indicates that Mr. Kaye shared with her a strategy of foregoing the entitlement hearing and instead pursuing an appeal.

Ms. Dilascio's next note is dated March 6, 2017, shortly after the special master's NCES order on February 16, 2017.  It provides that: "we didn't win and we didn't lose per Corey.  Judge doesn't think we have a case.  Whole cell pertussis – cited a case.  Need epidemiologist to make argument." (*Id.* at 9.)  A subsequent note from April 20, 2017, appears also to reference the special master's NCES order.  It states: "attorney- had a new theory – not apply to M[.D.]'s case . . . special master will proceed on the evidence we produced.  Get interim relief.  Decide if we're going to appeal.  Decision will be in 60 days.  Settlement offer: expert fees & expenses if we- They make a decision." (*Id.* at 7-8.)

### c.      Mr. Kaye's Response

Mr. Kaye submitted a response upon receipt of the motion for relief from judgment and the Dilascios' affidavits.  (ECF 183.)  He averred that his work on the case was unrelated to his disbarment.  His response explained that he "fully discussed all aspects of this case, and all decision making in [*sic*] reached in this case before they were made, including the decision not to appeal." (*Id.* at 2 (capitalization omitted).)  Many of the case updates he provided to the Dilascios were given at a horse-racing venue he and Mr. Dilascio frequented.  Mr. Kaye indicated that the horse track was also the site of discussions he had with Mr. Dilascio regarding the case outcome and the decision not to pursue appeal.  (*Id.*)

The decision not to pursue the entitlement hearing "was made in conjunction with the consultation of at least two other vaccine attorneys who both opinioned [*sic*] that nothing would be gained by this hearing other than the full cross examination of my expert." (*Id.* at 3.)  Based upon "these discussions, and my judgment" Mr. Kaye recommended not pursuing the hearing. (*Id.*)  Mr. Kaye also explained that he decided not to pursue additional evidence regarding the NCES study after he had "fully vetted" the issue with Dr. Gould, "who opined it would not be assistive in the final outcome." (*Id.*)

Mr. Kaye admitted that he "did not inform [the Dilascios] of the outcome of the fee motion, and that Mr. Dilascio has not been paid back" the amount he paid for Dr. Gould to appear at the hearing.  (*Id.* at 2.)  Mr. Kaye suggested that the decision not to appeal stemmed from the Dilascios' divorce proceedings, and that they "had tired of any litigation and of lawyers." (*Id.*)

### d.      Dr. Gould's Deposition

Dr. Gould was deposed by telephone on July 30, 2020, and the transcript was filed in the case.  (ECF 241-1.)  Dr. Gould testified that he had originally understood that there would be a trial in December, but Mr. Kaye told him that "the parents of the child had decided not to go further with it." (*Id.* at 7:5-11.)  He further stated that "[w]hen I was informed that there would be no trial, I was very surprised, because I firmly believed that this family had a real case . . . I thought that there was a persuasive argument." (*Id.* at 11:16-21.)  He was not paid for the trial or for trial preparation.  (*Id.* at 9:6-7.)

12

Dr. Gould was provided with the special master's February 2017 order regarding NCES evidence as a deposition exhibit.  (*Id.* at 10:8-12.)  He stated that "I saw it for the first time when you emailed it to me, I had never seen it before.  I was never aware of this.  I think it's incredibly unfortunate I was never made aware of this."  (*Id.* at 10:13-18.)  When asked whether Mr. Kaye had discussed the order with him at any time, Dr. Gould answered "[n]o. . . . I have no recollection ever of speaking with Corey Kaye about this."  (*Id.* at 11:2-11.)

### 3.    Petitioner's Challenge

The petitioner sought relief from judgment pursuant to RCFC 60(b)(6) due to her prior counsel's malfeasance and filed a second memorandum in support of her motion.  (ECF 185.)  That memorandum first responded to Mr. Kaye's unsworn statement provided in response to her initial motion and memorandum.  She noted that Mr. Kaye did not dispute the basic facts underlying her motion, such as the fact that he canceled the entitlement hearing on the eve of trial, "even when the Special Master questioned him as to whether the DiLascios wished to testify in the matter."  (*Id.* at 12.)  Mr. Kaye asserted that the petitioner requested the cancellation of trial on November 28, 2016, but the petitioner's notes indicate she was not made aware of the decision until a phone conversation on November 29.  (*Id.*)  The petitioner challenged Mr. Kaye's contention that he discussed the NCES issue with Dr. Gould, when Dr. Gould's fee affidavit indicates no time spent reviewing the applicability of the NCES study.  The petitioner also challenged Mr. Kaye's decision not to appeal given that the appeal strategy was the basis for foregoing an evidentiary hearing.  Finally, her memorandum noted that Mr. Kaye was not in communication with the Dilascios following the Merits Ruling.  (*Id.* at 15.)  The petitioner advanced three main points as her primary argument.

First, the petitioner argued that, under Rule 60(b)'s applicable legal standard, a court should grant a Rule 60(b) motion when "the need for justice and truth outweigh the value of finality in litigation."  (*Id.* at 17 (citing *G.G.M. v. Sec'y of HHS*, 122 Fed. Cl. 199, 204 (2015); *Infiniti Info. Sol., Inc. v. United States*, 93 Fed. Cl. 699, 704 (2010); *Curtis v. United States*, 61 Fed. Cl. 511, 512 (2004).)  She argued that similar cases have found that the harm to the petitioner from not granting the motion is far greater than to the respondent from granting it.  (*Id.* at 18-19, citing *Mora v. Sec'y of HHS*, 673 Fed. App'x 991, 997 (Fed. Cir. 2016) ("The circumstances of this case, which seem to penalize quite severely a now six-year-old paraplegic girl for her attorney's gross negligence, resonate with the remedial principle [of] Rule 60(b) . . . .").)

Second, the petitioner argued that she met the Rule 60(b)(6) standard in that her claim was not premised on Rule 60(b)(1)-(5) and was pursued within a reasonable time, and that

extraordinary circumstances justified relief.  The petitioner cited numerous cases regarding extraordinary circumstances that she alleged were analogous to her claim.[8]  (*Id.* at 21-22.)

Third, the petitioner argued that the balance of equities weighed in her favor, noting several factors.  The petitioner argued she had no other remedies to receive compensation for M.D.'s vaccine injury.  She argued that she was harmed by the judgment, and that she had a potential off-Table injury claim.  Mr. Kaye had failed to prosecute her claim as evidenced by the multiple show cause orders, the cancellation of the entitlement hearing only five days prior to its scheduled start, the rejection of the special master's offer of assistance via an order permitting briefing on supportive evidence, and the failure to appeal after informing the petitioner that an appeal was her best strategy.  Finally, Mr. Kaye had misled the petitioner by failing to consult her prior to cancelling the hearing, failing to inform her of the judgment, failing to represent the petitioner's own costs in his General Order #9 submission, failing to reimburse her, and failing to notify her that he had been disbarred.

The respondent filed a response to the RCFC 60(b) motion on October 2, 2018.  (ECF 193.)  The respondent acknowledged Mr. Kaye's ethical defalcations and charges of criminal misconduct but emphasized that the question before the special master was "not whether Mr. Kaye was a dishonest lawyer, but whether petitioner has presented 'highly convincing' evidence showing that his course of conduct was designed to deliberately deceive petitioner about the merits of her son's claim, and that he, in fact, broke the agency bond created by the attorney-client relationship in abandoning MD's case."  (*Id.* at 13.)  The respondent argued that Mr. Kaye had not, in fact, committed such acts but instead had actively pursued the claim.  The respondent noted that Mr. Kaye had filed medical records, an expert report, and medical literature in support of the claim.  (*Id.*)  Though Mr. Kaye had struggled with timeliness, Ms. Dilascio could show no prejudice as a result because the claim had not been involuntarily dismissed.  In fact, the petitioner's claim was heard and resolved on the merits, after thorough factual development.

The respondent disputed Ms. Dilascio's claims that Mr. Kaye was not in contact with her, noting that her handwritten notes demonstrated several conversations following the cancellation of the December 2 hearing.  In particular, the respondent noted that the Dilascios did not claim that they had tried to reach Mr. Kaye but were unable to, or that Mr. Kaye had lied to them when they did reach out.  Instead, the respondent argues that the Dilascios simply failed to seek regular updates on the claim.  The respondent also clarified that Mr. Kaye "vigorously pursued settlement, but negotiations between the parties were brief," and confirmed that no tentative offer of settlement was made by the respondent to merit presentation to Ms. Dilascio.  (*Id.* at 3 n.1.)

---

[8] Among the cases cited by the petitioner were *Freeman v. Sec'y of HHS*, 35 Fed. Cl. 280 (1996); *Coleman v. Sec'y of HHS*, No. 06-0710V, 2011 WL 6828475 (Fed. Cl. Spec. Mstr. Dec. 7, 2011); *Primbs v. United States*, 4 Cl. Ct. 366 (1984); *Cmty Dental Svcs. v. Tani*, 282 F.3d 1164, 1171 (9th Cir. 2002); *Carter v. Albert Einstein Med. Ctr.*, 604 F. 2d 805 (3d Cir. 1986); and *In re Virginia Info. Sys. Corp.*, 932 F. 2d 338, 342 (4th Cir. 1981).

The respondent concluded by noting that Ms. Dilascio cited no factual or legal evidence or arguments that Mr. Kaye should have offered in the proceeding but did not.  (*Id.* at 21.)

The petitioner replied to the respondent's brief on October 31, 2018.  (ECF 196.)  The reply challenged the respondent's reliance upon the events as set forth in Mr. Kaye's unsworn statement, questioning his reliability as a witness given his disbarment and the criminal charges against him for defrauding clients.  (*Id.* at 2 (citing, among other cases, *Swick v. Sec'y of HHS*, 2018 WL 1514453 at *7 (Fed. Cl. Spec. Mstr. Feb. 26, 2018) (finding a disciplinary order reduced a witness's credibility)).)  She argued that she had presented "highly convincing" evidence that Mr. Kaye actively misled Ms. Dilascio.  She challenged the respondent's suggestion that the cancellation of the entitlement hearing was ratified by Ms. Dilascio; the petitioner suggested that she believed that she should rely on an appeal, pointing to deception rather than ratification.  (*Id.* at 7.)  She argued that she did not have a full and fair opportunity to be heard when she was erroneously denied the chance for cross-examination at a hearing.  (*Id.*)  She noted finally that the Third, Sixth, Ninth, and D.C. Circuits had held that an attorney's gross negligence warranted relief from a default judgment under FRCP 60(b)(6), citing *Cmty Dental Svcs. v. Tani*, 282 F.3d 1164, 1171 (9th Cir. 2002) (collecting cases).[9]

### 4.    Special Master's Findings

On December 17, 2020, the special master denied the petitioner's motion for relief from judgment ("Decision").  (ECF 246.)  The special master's findings centered around (1) the cancellation of the December 2 hearing, (2) the decision not to present the NCES evidence, and (3) the decision not to appeal.

First, regarding the cancellation of the December 2 hearing, the special master noted that, although the case was submitted on the papers, Mr. Kaye "prepared and submitted all relevant documents and briefings, including medical records, an expert report, and a pre-hearing brief." (*Id.* at 19.)  He found no evidence of efforts to mislead Ms. Dilascio about foregoing the hearing; instead, he found that Mr. and Ms. Dilascio were aware that Mr. Kaye had recommended, as a strategic decision, not participating in an entitlement hearing but instead focusing on appeal as a superior strategy.  Regardless of whether Ms. Dilascio discussed the cancellation with Mr. Kaye

---

[9] The petitioner cites *Tani*, 282 F.3d at 1171, which discusses cases in the Third, Sixth, and D.C. Circuits.  *See Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 806 (3d Cir. 1986) (reversing denial of plaintiff's Rule 60(b) motion based on plaintiff's counsel's "blatant disregard for explicit [court] orders"); *Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 195 (6th Cir. 1986) ("Although a party who chooses an attorney takes the risk of suffering from the attorney's incompetence, we do not believe that this record exhibits circumstances in which a client should suffer the ultimate sanction of losing his case without any consideration of the merits because of his attorney's neglect and inattention."); *L.P. Steuart, Inc. v. Matthews*, 329 F.2d 234, 235 (D.C. Cir. 1964) (finding that Rule 60(b)(6) "is broad enough to permit relief when as in this case personal problems of counsel cause him grossly to neglect a diligent client's case and mislead the client").

beforehand, the special master concluded that her knowledge of the strategy served as ratification; she could have changed her mind and requested to proceed with the hearing but did not.  The Decision concluded that "Rule 60(b)(6) relief is not available in a case where a party has made a decision (albeit an ill-advised one)."  (ECF 246 at 20 (citing *Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986); *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 356-57 (5th Cir. 1993)).)

Second, the special master considered the decision not to present the NCES evidence, as outlined in his February 2017 order.  (ECF 156.)  The special master rejected Ms. Dilascio's argument that Mr. Kaye "actively misled her regarding the best way to proceed," reading Ms. Dilascio's notes to suggest that Mr. Kaye consulted her before making the decision.  (ECF 246 at 21 (citing ECF 196 at 8).)  Although the special master noted that the "facts are most unclear as to what Mr. Kaye did or did not do regarding the NCES" and "[w]hether Mr. Kaye gathered sufficient information to provide Ms. Dilascio with good advice is certainly debatable," he nevertheless determined that "Mr. Kaye could reasonably conclude and advise Ms. Dilascio that expert reports about the NCES were not likely to make Ms. Dilascio's case successful."  (ECF 246 at 22.)

The special master focused on the provision of advice itself, rather than the quality of the advice.  (ECF 246 at 22 ("the quality of Mr. Kaye's advice is less relevant than the fact that he advised Ms. Dilascio").)  The record is unclear as to whether Mr. Kaye did in fact discuss the NCES opportunity with Dr. Gould.  The fact that Mr. Kaye participated in the case at all, the special master found, distinguishes the case from those in which attorneys wholly refused to participate in the litigation or to comply with court orders.

The Decision also noted that several decisions by special masters "indicate that epidemiological findings relating to the safety of DTP [whole cell] vaccines cannot be transferred to the DTaP [acellular] vaccine Ms. Dilascio's son received."  (ECF 246 at 22-23.)  The special master concluded that "pursuit of the NCES was likely futile."  (*Id.*)  Based on the futility of the NCES approach, the special master also concluded that the choice not to pursue the approach did not amount to abandonment.  (*Id.*)

Finally, the special master addressed Mr. Kaye's decision not to appeal following the Merits Ruling.  In determining whether a failure to file an appeal after an adverse judgment constitutes attorney abandonment, courts often examine whether the client was diligent in pursuing her rights and following up on her case.  The special master cited both *Maples v. Thomas*, 565 U.S. 266 (2012) (permitting an abandonment claim to proceed when a criminal defendant's attorneys left the law firm with which they had been associated but failed to file a motion to withdraw or advise the client they could no longer represent him, leading to the expiration of the time for filing an appeal) and *Holland v. Florida*, 560 U.S. 631 (2010).  In *Holland*, the Supreme Court found that the attorney's failure to file a timely appeal was conduct worse than a "garden variety claim of excusable neglect" when the death-row-inmate client had sent letters to his attorney inquiring about the status of his case and imploring the attorney to preserve any appellate rights."  *Holland*, 560 U.S. at 651-52.  The special master also cited to *Sneed v. McDonald*, 819 F.3d 1347 (Fed. Cir. 2016), in which the Federal Circuit placed some responsibility for preserving appellate rights with the client, noting that "reasonable diligence

requires that the client check with the attorney before the statutory filing time is about to run out to confirm that the attorney will undertake the representation." *Id.* at 1354.

In keeping with the line of cases on client diligence, the special master found that Ms. Dilascio had not been sufficiently diligent in keeping up with her case. The Decision noted that "Ms. Dilascio's notes show that as of April 20, 2017, she was aware that a decision was imminent and likely would be within 60 days," and that "Ms. Dilascio has not described any attempts she made to ascertain the status of her case or to confirm that Mr. Kaye had filed a motion for review." Based on these findings, the special master concluded that "[t]his is far from diligent efforts to pursue her appellate right." (ECF 246 at 25.)

Instead, the special master found that Mr. Kaye had been actively involved in the case following the decision on the merits by both filing a motion for redaction within the period allotted and seeking attorney's fees and costs. The special master also noted that Mr. Kaye must have been in communication with Ms. Dilascio to obtain her signature on the General Order #9 statement. (*Id.* at 25-27.) To fault Mr. Kaye for not filing an appeal would "effectively require attorneys to file motions for review in all cases or risk being considered to have committed professional negligence sufficient to constitute extraordinary circumstances." (*Id.* at 27.)

Based on these findings, the special master denied Ms. Dilascio's motion for relief from judgment, ultimately concluding that "poor representation is markedly different from failing to represent her at all." (*Id.* at 28.) A public decision was issued on January 11, 2021. (ECF 246.)

C.     **Motion for Review**

On January 16, 2021, the petitioner filed a motion for review of the special master's decision denying relief from judgment. (ECF 247.) The parties have fully briefed the matter, and the Court heard oral argument on April 1, 2021.

## II.    STANDARD OF REVIEW

On the petitioner's motion for review, the Court evaluates under RCFC App. B 36(b)(7) whether the special master abused his discretion in denying the petitioner's motion for relief under RCFC 60(b).

A.     **Motion for Review**

This court has jurisdiction to review the decisions of special masters. 42 U.S.C. § 300aa-12(e); RCFC App. B 36(b)(6).

In evaluating a special master's decision, "the assigned judge may set aside the ruling only if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." RCFC App. B 36(b)(7); *see Patton v. HHS*, 25 F.3d 1021, 1029 (Fed. Cir. 1994). When reviewing a legal determination, no deference is afforded to the special master's decision, which the court reviews *de novo*; in reviewing a special master's factual determinations, the court may only set them aside if they are "arbitrary and capricious." *Munn v.*

*HHS*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).  The court reviews a special master's discretionary rulings under an abuse-of-discretion standard.  *Id.*

In the Rule 60(b) context, "'[t]he grant or denial of a motion for relief from judgment is discretionary, and the standard of review [on a motion to review] therefore is whether the trial court abused its discretion.'"  *Sioux Tribe of Indians v. United States*, 862 F.2d 275, 279 (Fed. Cir. 1988) (quoting *United States v. Atkinson*, 748 F.2d 659, 660 (Fed.Cir.1984)).  "An abuse of discretion exists 'when the trial court's decision is clearly unreasonable, arbitrary or fanciful, or is based on clearly erroneous findings of fact or erroneous conclusions of law.'"  *Lazare Kaplan Int'l*, 714 F.3d at 1293 (quoting *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed. Cir. 2002)).

In resolving the petitioner's motion for review, the Court must consider whether the special master abused his discretion in denying the petitioner's motion for relief from judgment.

### B.       Rule 60(b) Standard

A party seeking relief from a decision may file a motion for reconsideration under RCFC 60(b).[10]  The rule permits judges and special masters "to relieve a party or its legal representative from a final judgment, order, or proceeding" under specific circumstances.[11]  RCFC 60(b); RCFC App. B 36(b).  The Court must determine whether the special master abused his discretion in denying the petitioner's motion under RCFC 60(b).

RCFC 60(b)(6), a catch-all provision for claims not falling within the other, more specific provisions of RCFC 60(b), permits a court to grant a motion for reconsideration for "any other reason that justifies relief."  RCFC 60(b)(6).  The broad scope of RCFC 60(b)(6) provides a "grand reservoir of equitable power to do justice in a particular case."  *Lazare Kaplan Int'l Inc. v. Photoscribe Techs., Inc.*, 714 F.3d 1289, 1295 (Fed. Cir. 2013) (quoting *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012)).  Relief under RCFC 60(b)(6) may be granted if "such action is appropriate to accomplish justice."  *CEATS, Inc. v. Cont'l Airlines, Inc.*, 755 F.3d 1356, 1361 (Fed. Cir. 2014).

Despite the broad scope of Rule 60(b)(6), relief may be afforded only in "extraordinary circumstances."  *Ackermann v. United States*, 340 U.S. 193, 198, 202 (1950); *CEATS*, 755 F.3d at 1361.  The determination of whether such extraordinary circumstances exist in a particular case lies within the discretion of the judge hearing the case.  *Klapprott v. United States*, 335 U.S.

---

[10] Because RCFC 60 is identical to Rule 60 of the Federal Rules of Civil Procedure ("FRCP"), the court also considers cases analyzing FRCP 60 in evaluating motions under RCFC 60(b).  *Dobyns v. United States*, 915 F.3d 733, 737 n.1 (Fed. Cir. 2019).

[11] In a case not previously reviewed by a judge of the Court of Federal Claims, as is the case here, a special master may consider, in the first instance, a motion seeking relief from judgment under RCFC 60.  RCFC App. B. Rule 36(a)(2).

601, 615 (1949) (noting that paragraph (6) of Rule 60(b) gives the courts the power to "vacate judgments whenever such action is appropriate to accomplish justice").

Before granting a moving party relief under RCFC 60(b)(6), the court "must find that a 'grave miscarriage of justice' would result if relief is denied." *Kennedy v. Sec'y of HHS*, 99 Fed. Cl. 535, 540 (2011), *aff'd*, 485 F. App'x 435 (Fed. Cir. 2012) (quoting *United States v. Beggerly*, 524 U.S. 38, 47 (1998)). In making its determination, the court must consider whether "'the need for truth outweighs the value of finality in litigation.'" *Mora v. HHS*, No. 13-421V, 2015 WL 1275389, at *2 (Fed. Cl. Spec. Mstr. Feb. 27, 2015) (quoting *Curtis v. United States*, 61 Fed. Cl. 511, 512 (2004)), *aff'd*, 122 Fed. Cl. 199 (2015), *aff'd* 673 Fed. App'x 991 (Fed. Cir. 2016).

## III.   ANALYSIS

In reviewing the Decision, the Court must determine whether the special master's reasoning was clearly unreasonable, arbitrary or fanciful, or based on clearly erroneous findings of fact or conclusions of law in concluding that Mr. Kaye did not abandon Ms. Dilascio by cancelling the December 2 hearing. *Lazare*, 714 F.3d at 1293.

Ms. Dilascio primarily challenges the special master's finding under agency law, arguing that the special master "erroneously never considers whether Mr. Kaye's misconduct *itself* severed the attorney-client relationship," because, she asserts, his interests became adverse to the Dilascios once he determined that a settlement was not feasible. (ECF 247 at 10 (emphasis in original).) The petitioner also challenges the special master's finding that Ms. Dilascio ratified the cancellation of the entitlement hearing and argues that Mr. Kaye's purported strategy of pursuing an appeal was "absurd." (*Id.* at 12-13.) The petitioner develops and pursues her arguments based largely on inferences drawn from the record rather than specific evidence in the record.

The respondent counters that the facts of the case were fully set forth in undisputed medical records, and that the special master's exhaustive account of the communications between Mr. Kaye and Ms. Dilascio in the Decision demonstrated the nature of the attorney–client relationship.

In evaluating the petitioner's motion, the Court turns first to the special master's finding that Mr. Kaye did not abandon the petitioner in foregoing the entitlement hearing. The Court next considers the Decision's findings regarding the NCES opportunity and concludes by analyzing Mr. Kaye's decision not to appeal.

### A.   Findings Regarding the Entitlement Hearing

The Court agrees with the petitioner that Mr. Kaye's decision to forego the entitlement hearing, particularly after obtaining the funds to retain Dr. Gould, reflected an unusual strategy. The Court is unprepared, however, to conclude that Mr. Kaye's decision amounted to an abandonment of the petitioner. Rule 60(b)(6) does not relieve a party from a "free, calculated, and deliberate choice." *Paul Revere Variable Annuity Ins. Co. v. Zang*, 248 F.3d 1, 6 (1st Cir. 2001) (quoting *Ackermann*, 340 U.S. at 198). As the Second Circuit observed in *Nemaizer*, "an

attorney's failure to evaluate carefully the legal consequences of a chosen course of action provides no basis for relief from a judgment." 793 F.2d at 62 (analyzing Rule 60(b)(1)).

The special master concluded, upon a thorough review of the record, that Mr. Kaye made a strategic decision to cancel the hearing. At the time the case was submitted, after the petitioner waived the entitlement hearing, the special master had before him a well-developed record, consisting of briefs, medical records, and an expert report that Mr. Kaye had arranged. (ECF 246 at 19.) Given these materials, the special master found he was able to issue a comprehensive decision on the merits without the benefit of a hearing. Cross-examination at the entitlement hearing might have helped the petitioner, but it might have been harmful as well. That is the kind of evaluation, going to tactical and strategic advantage, that attorneys must routinely make on behalf of their clients. A trial can be wholly unpredictable, and if a lawyer is unsure of the strength of the case, allowing a judicial officer to weigh a paper record may be a preferable approach. Against this backdrop, the special master had a reasonable basis for determining that Mr. Kaye did not abandon his client simply by making the "deliberate," though perhaps not wise, choice to forego the entitlement hearing. *Paul Revere*, 248 F.3d at 6.

The Court is unprepared to find, as Ms. Dilascio suggests, that Mr. Kaye's interests and those of the Dilascios were adverse when the decision to forego the entitlement hearing was made. The end of settlement negotiations, and with them the prospect of quick money for Mr. Kaye, may have played a part in Mr. Kaye's decision to cancel the hearing. The Court does not take lightly the criminal charges against Mr. Kaye that relate directly to the misappropriation of clients' settlement awards. Nevertheless, there is insufficient evidence in the record to conclude that Mr. Kaye acted in bad faith in pursuing the cancellation. The petitioner has not put forth any evidence that the special master ignored in his Decision. Nothing in this record, aside from innuendo and inference, demonstrates that Mr. Kaye acted in his own interest.

To the contrary, the structure of the Vaccine Program suggests that self-interest did not motivate Mr. Kaye. Unlike typical tort litigation, in which the attorney often represents a plaintiff under a contingency-fee arrangement, attorneys representing petitioners in the Vaccine Program are paid directly by the Program itself, as Mr. Kaye in fact was. Lawyers can, subject to judicial oversight, maximize their fees by extending the litigation and expending more time on it. As this case itself shows, a vaccine petitioner's counsel may receive an award of fees even when the petition itself is unsuccessful. They may also petition for an award of interim fees to sustain their effort to pursue a claim, although Mr. Kaye never sought an interim-fee award. That prospect distinguishes vaccine-injury litigation from typical tort litigation. The petitioner's assertion that Mr. Kaye's self-interest in fees trumped the petitioner's interests makes little sense in this context.

Even if Mr. Kaye's self-interest clashed with the interests of his client, the special master's finding that Ms. Dilascio could have directed her attorney to proceed with the entitlement hearing as planned is reasonable. That Ms. Dilascio did not protest the strategic direction of her attorney lends more weight to the contention that she had made a "free, calculated, and deliberate choice." *Kennedy*, 99 Fed. Cl. at 548.

The Court concludes that the special master did not abuse his discretion in determining that Mr. Kaye did not abandon his client by choosing not to pursue an entitlement hearing.

### B.    Findings Regarding the NCES Order

The Court next considers the challenge to the special master's finding that the petitioner's attorney did not abandon her by declining to submit additional evidence based on the NCES.

The petitioner argues that Mr. Kaye's decision not to pursue the NCES theory constituted a serious breach of loyalty.  By failing to "pursue additional expert advice about presenting additional evidence in pursuit of a favorable entitlement decision for her claim," the attorney was not acting in a manner consistent with the best interests of his client.  (ECF 247 at 10.)

The petitioner also challenges the Decision's reasoning that the cases rejecting the NCES's applicability to DTaP vaccinations demonstrate that Mr. Kaye's advice was justified.  She argues that Mr. Kaye could have relied on a special master's decision in *Kottensette v. Sec'y of Health & Human Servs.*, No. 15-1016V, 2017 WL 6601878 (Fed. Cl. Spec. Mstr. Dec. 12, 2017).  The special master relied on the reversal of the decision in that case to rebut her claim, but the petitioner points out that the decision was not vacated until 2020, well after Mr. Kaye might have relied on it to inform his strategy.  *See Kottenstette v. Sec'y of Health & Human Servs.*, No. 15-1016V, 2020 WL 953484, at *5 (Fed. Cl. Feb. 12, 2020), *on remand*, 2020 WL 4197301 (Fed. Cl. Spec. Mstr. June 2, 2020), *aff'd*, 2020 WL 4592590 (Fed. Cl. July 27, 2020), *appeal pending*, No. 20-2282 (Fed. Cir.).

The petitioner's argument misapprehends the fact-specific nature of vaccine claims.  Mr. Kaye could well have relied on the 2017 decision in *Kottenstette*, but such reliance may not have made any difference.  A "Special Master is not bound to follow the opinions of other Special Masters" and "[c]ausation in fact under the Vaccine Act is . . . based on the circumstances of the particular case."  *Boatmon v. HHS*, 941 F.3d 1351, 1358-59 (Fed. Cir. 2019) (citations omitted).  Therefore, the case law does not establish that Mr. Kaye would have been able to pursue successfully an argument based on the NCES.  Indeed, the distinction between the acellular version of the DTaP vaccine that M.D. had received and the whole-cell DTP vaccine studied in the NCES was in fact pointed out by the special master at the time he raised the possibility of building on the NCES with other evidence more relevant to a claim based on the DTaP vaccine.

The facts of her case, Ms. Dilascio argues, are distinguishable from the cases cited by the special master in his Decision.  The respondent counters that only one of the Decision's cited cases denying the applicability of the NCES to cases like the petitioner's was published after February 2017, when the special master issued the order recommending NCES's use.

The Court finds that the special master did not abuse his discretion in determining that Mr. Kaye did not abandon his client by foregoing pursuit of the NCES theory.  As noted in the Decision, several factors weighed against the presentation of additional evidence: the uncertain likelihood of success, the significant investment of resources potentially required, and the potential of a multi-year delay in the resolution of the petition.  (ECF 246 at 22.)  Mr. Kaye could have reasonably concluded that pursuing such a path posed too great a challenge with slim odds

for victory.  His decision reflects again the underlying problem with his representation of the petitioner, which was his lack of expertise in the vaccine program.  That shortcoming is very different from the petitioner's claim that Mr. Kaye abandoned the case.  The record tends to support that Mr. Kaye mishandled the case, but not that he abandoned the petitioner.

Relevant case law suggests that negligence or bad advice of counsel does not, on its own, meet the standard required to secure reconsideration under RCFC 60(b)(6).  In *G.G.M. v. Sec'y of Health and Human Servs.*, the court noted that "counsel's failure to conduct basic legal research has had and will continue to have extremely negative repercussions for [the petitioner]." 122 Fed. Cl. 199, 205 (2015).  Judge Kaplan nevertheless held that "the standards for granting relief under Rule 60(b)(6) are demand[ing], and the determination whether they are met in any particular instance is a highly discretionary one." *Id.*  Applying that standard, Judge Kaplan upheld the special master's denial of a motion under RCFC 60(b). *Id.  See also United States v. 7108 W. Grand Avenue*, 15 F.3d 632, 634 (7th Cir. 1994) (holding that clients were bound by their attorney's acts, even if willful or grossly negligent, and denying Rule 60(b)(6) relief); *Kennedy*, 99 Fed. Cl.at 548 ("Courts have generally refused to grant relief under [Rule 60(b)(6)] based upon the ineffective assistance of counsel").

Mr. Kaye did not conduct a thorough evaluation of the NCES opportunity the special master presented, as evidenced by the fact that Dr. Gould, the petitioner's own expert, was never made aware of the NCES order.  (ECF 241-1.)  The Court agrees with the special master that it is certainly "debatable" whether "Mr. Kaye gathered sufficient information to provide Ms. Dilascio with good advice." (ECF 246 at 22.)  Nevertheless, Rule 60(b)(6) requires extraordinary circumstances before a court may revise a prior judgment.  Willful or grossly negligent acts by an attorney do not typically satisfy the stringent Rule 60(b)(6) standard. *7108 W. Grand Ave*, 15 F.3d at 634.  Although the Court is not prepared to foreclose the possibility that gross negligence by counsel could constitute abandonment to satisfy the Rule 60(b)(6) standard in an appropriate case, the abuse-of-discretion standard requires more before this Court may disturb a special master's findings to the contrary in this case.

The Court holds that the special master's findings regarding the NCES order are supported by the available documentation in this record and are consistent with the weight of legal authority.

## C.    Findings Regarding the Failure to Appeal

The petitioner argues that Mr. Kaye's failure to file a motion for review following the Merits Ruling constituted abandonment.  The special master held otherwise.  This argument presents the closest call.

In determining whether a failure to file an appeal constitutes attorney abandonment, courts often examine whether the client was diligent in pursuing her rights and following up with her attorney on her case.  The special master's Decision cited several cases, including *Sneed v. McDonald*, 819 F.3d 1347 (Fed. Cir. 2016), in which the Federal Circuit placed some responsibility for preserving appellate rights with the client, noting that "reasonable diligence

requires that the client check with the attorney before the statutory filing time is about to run out to confirm that the attorney will undertake the representation." *Id.* at 1354.

In keeping with the line of cases on client diligence, the special master found that Ms. Dilascio was not diligent in keeping up with her case. He determined that "Ms. Dilascio's notes show that as of April 20, 2017, she was aware that a decision was imminent and likely would be within 60 days," and that "Ms. Dilascio has not described any attempts she made to ascertain the status of her case or to confirm that Mr. Kaye had filed a motion for review." The special master concluded that "[t]his is far from diligent efforts to pursue her appellate right." (ECF 246 at 25.)

The special master did find that, contrary to the petitioner's assertions, Mr. Kaye was actively involved in the case following the decision on the merits. The special master noted that Mr. Kaye filed a motion for redaction within the extended time allotted for the motion. Although it obviously reflects his own self-interest, Mr. Kaye also filed a motion seeking attorney's fees, and he must have been in communication with Ms. Dilascio to obtain her signature on the General Order #9 statement. (*Id.* at 25-27.) To fault Mr. Kaye for not filing an appeal would "effectively require attorneys to file motions for review in all cases or risk being considered to have committed professional negligence sufficient to constitute extraordinary circumstances." (*Id.* at 27.)

The petitioner argues that "the relevant attorney abandonment standard is whether the record demonstrates the attorney was still functioning as the client's agent at the time of the relevant act or omission." (ECF 247 at 14.) In contrast to cases of attorney misconduct, Rule 60(b)(6) relief may be appropriate when the client is left without *sufficient* representation. *Heim v. Comm'r of Internal Revenue*, 872 F.2d 245, 248-49 (8th Cir. 1989) (holding that the gross negligence of an attorney does not satisfy Rule 60(b)(6) but "leaving his clients unrepresented" would); *Foley v. Biter*, 793 F.3d 998 (9th Cir. 2015) (reversing district court order and granting relief when abandonment of petitioner prevented a timely appeal). As to the client's own obligations, the petitioner contends that the diligence required is merely the "effort that a reasonable person might be expected to deliver under his or her particular circumstances." *Doe v. Busby,* 661 F.3d 1001, 1015 (9th Cir. 2011).

Based on the standard the petitioner sets forth, she argues that the special master's decision was arbitrary and ignored crucial evidence. She asserts that the history of the case demonstrates that several months routinely passed without updates from Mr. Kaye to the Dilascios about the case. Those routine delays, she argues, should negate any obligation on Ms. Dilascio to have engaged in regular contact with Mr. Kaye for updates. Rather, it was entirely reasonable, based on the history of their communications, for Ms. Dilascio to wait to hear from Mr. Kaye. She points out further that "Mr. Dilascio, who had been Mr. Kaye's main contact, never heard from Mr. Kaye after paying him $13,000.00 but was diligent in having an attorney explore the status of this case while discovering Mr. Kaye had been disbarred for acts of malfeasance." (ECF 247 at 18.) Ms. Dilascio argues that she acted as any reasonable person would have, given the method of communications passing through Mr. Dilascio, her focus on medical care for her son, and the history of long gaps between attorney–client communications.

The petitioner also challenges the special master's finding that she was in communication with Mr. Kaye for either the motion for attorney's fees or the motion to redact, arguing there is no evidence in the record to support such a finding. That Mr. Kaye may have communicated what was necessary to get paid does not mean, she suggests, that he promptly informed his client about the decision on the merits or obtained proper informed consent.

The respondent argues that the petitioner makes no claim that she attempted to but could not reach Mr. Kaye or that he actively lied to her. "For the Dilascio[s'] contentions to be true, one has to accept that neither of them w[as] made aware of the status of MD's case by Mr. Kaye for over a year, that they both also failed to make any inquiries of Mr. Kaye for over year about the anticipated decision in the case, and that they were both surprised to learn in late April 2018 that an adverse judgment had been entered in MD's case after no appeal was filed." (ECF 249 at 18-19.)

The Court finds no abuse in discretion in the special master's conclusion that Mr. Kaye did not abandon Ms. Dilascio by failing to file an appeal. The Court appreciates the challenges imposed on Ms. Dilascio in providing at-home care for M.D. as well as the unusual communication method between the Dilascios and Mr. Kaye, which may have deteriorated following the Dilascios' divorce. Despite these circumstances, the case presents indications of gross negligence and incompetence by Mr. Kaye rather than signs that Mr. Kaye left Ms. Dilascio wholly unrepresented. *See Heim*, 872 F.2d at 248-49. As noted in the Decision, Mr. Kaye continued to make post-decision filings that demonstrate continued representation of Ms. Dilascio. The filing of ministerial paperwork does not necessarily suggest robust representation by counsel, but it reflects that Mr. Kaye was still actively involved in the case.

Most problematic is that Mr. Kaye's decision to forego the entitlement hearing was premised on a strategy that depended on filing an appeal. His failure to do so is, at best, puzzling, and perhaps grossly negligent; that failure lends credibility to the petitioner's inferential arguments. The strategy, however, appears to have been shared with the petitioner at the time it was made, as her own notes of her November 29, 2016 discussion with Mr. Kaye imply. That awareness of the strategy to forego the entitlement hearing and rely on an appeal (or, as correctly styled, a motion for review) would have imposed on Ms. Dilascio some responsibility to inquire into how Mr. Kaye was carrying out the approach on which they had decided. Ms. Dilascio knew that Mr. Kaye had resolved to forego an entitlement hearing, obtain what he presumed would be an adverse ruling by the special master, and then file a motion for review in this court. Because she knew of this strategy and did not inquire about subsequent steps after the adverse ruling, Ms. Dilascio cannot be said to have satisfied the obligations the law imposes on a client. At least, the Court cannot say that the special master's decision was arbitrary and capricious, given the precedents of *Holland* and *Sneed* regarding a client's diligence.

The Court may well have reached a different conclusion than did the special master on this last issue presented by the petitioner if making the decision in the first instance. Under the deferential standard of review the Court owes to the special master's findings, however, the Court is not prepared to find the special master's conclusion—that Ms. Dilascio was not sufficiently diligent in this case—to be arbitrary, capricious, or an abuse of discretion.

IV.     **CONCLUSION**

Mr. Kaye did not represent Ms. Dilascio with unwavering vigor, through timely filings, or by making thoroughly researched, well-informed strategic and tactical decisions.  The court and petitioners typically benefit from an exceptional bar specializing in vaccine claims.  The petitioner did not avail herself of this bar.  Mr. Kaye had no apparent experience with the program and was, besides, dishonest, stealing money from his clients. The Court does not take lightly his disbarment and the criminal charges brought against him.

Nevertheless, the scope of this Court's review of the special master's findings is quite limited.  In addition, relief under RCFC 60(b)(6) may be granted only in "extraordinary circumstances."  *CEATS*, 755 F.3d at 1361.

Although the Court may not have reached the same conclusion as the special master regarding the petitioner's motion in the first instance, under the governing standard of review, the Court does not find the special master's decision to be arbitrary, capricious, or an abuse of discretion.  The petitioner has not pointed to evidence in the record that the special master overlooked or misconstrued.  Her arguments based on inferences drawn from that record are insufficient to overcome the special master's careful parsing of the record and his thorough explanation of the reasoning behind his rejection of the petitioner's motion.

The special master determined that Mr. Kaye's inadequate representation of Ms. Dilascio did not amount to abandonment sufficient to meet the Rule 60(b)(6) standard.  Because that determination is not arbitrary, capricious, or an abuse of discretion, the Court finds that the special master did not err in finding for the respondent.

Accordingly, the Court **DENIES** the petition for review and **SUSTAINS** the special master's decision of December 17, 2020, denying the petitioner's motion for relief from judgment.

The parties shall review this decision and advise the Court no later than **April 23, 2021**, of any proposed redactions to the decision so that the Court may make the decision publicly available.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**